582 So.2d 295 (1991)
STATE of Louisiana
v.
Joseph MORRISON.
No. 90 KA 0873.
Court of Appeal of Louisiana, First Circuit.
May 16, 1991.
*297 Bryan Bush, Dist. Atty., Baton Rouge by Charles Grey, Asst. Dist. Atty., for plaintiff/appellee.
Joe Thompson, Baton Rouge, for defendant/appellant.
Before LOTTINGER, SHORTESS and CARTER, JJ.
CARTER, Judge.
Defendant, Joseph Morrison, was charged by bill of information with cruelty to a juvenile, a violation of LSA-R.S. 14:93. Defendant pled not guilty and, after trial by jury, was found guilty as charged. Subsequently, defendant was sentenced to imprisonment at hard labor for a term of nine years with credit for time served. Defendant has appealed urging ten assignments of error, as follows:
1. There was insufficient evidence to support defendant's conviction.
2. The evidence fails to establish beyond a reasonable doubt that defendant specifically intended to commit the charged offense.
3. Defendant's conviction is based upon insufficient circumstantial evidence and does not prove the elements of the charged offense beyond a reasonable doubt.
4. The conviction is based entirely on circumstantial evidence, and the elements of the charged offense were not proven to the exclusion of every reasonable hypothesis of innocence.
5. The injuries and suffering of the child, the photographs of the child depicting his injuries, and the jury's viewing of the child during the trial so inflamed the members of the jury against defendant that they disregarded their duty to demand proof of guilt beyond a reasonable doubt and disregarded the accidental nature of the injuries.
6. The trial court denied defense counsel an opportunity to cross-examine Elaine Buckner, the child's mother, regarding her knowledge of defendant's care, treatment of the child, her efforts to aid defendant in requesting the district attorney to dismiss the instant charge and the fact that her testimony was influenced due to a threat to take the child from her if she "saw" defendant or aided him in any way in the conduct of his trial.
7. Defense counsel was prohibited from arguing an objection and laying a foundation for the purpose of impeaching Elaine Buckner's testimony or questioning *298 her credibility due to outside influences.
8. The testimony of a state witness recounting a statement of the child was hearsay and elicited without any corroborating testimony whatsoever.
9. The jury gave undue weight to the state's expert medical witness regarding the non-accidental nature of the child's injuries.
10. The sentence imposed on defendant, a man with no prior felony convictions, was excessive.
The record reflects that the instant offense occurred on August 24, 1988, in Baton Rouge. Michael Buckner, the victim of the offense, was slightly less than three and one-half years old at the time of the offense.[1]
On August 24, 1988, Elaine Buckner was living in a home in Baton Rouge with her sons, Michael Buckner and thirteen-year-old Donald Blackshear; her adult sister, Barbara Lynn Cavalier; and defendant, with whom Elaine was romantically involved. Defendant had been living with Elaine for several months. According to Elaine, defendant was over seventeen years old in August of 1988, and she "believes" that he is thirty-nine years old.
On the morning of August 24, 1988, defendant, accompanied by the victim, drove Elaine to her place of employment in her car. Later, at about 8:00 a.m. after defendant and the victim had returned home, defendant telephoned Elaine at work and informed her that the victim had been badly burned while in the bathtub. Elaine instructed defendant to come get her. Defendant complied. When they arrived at their home, Elaine quickly exited her car and went into her residence. Elaine found the victim on the sofa in the living room. The victim was undressed and wrapped in a sheet. Elaine observed that the victim's skin was peeling from his feet, backside and legs, and he was continuously moaning. Elaine began crying and told defendant: "Let's go to the hospital." Elaine put the victim in her car, and defendant drove Elaine and the victim to the hospital. They arrived at the hospital within about fifteen to twenty minutes. While Elaine and defendant were at the hospital, defendant told Elaine that he was outside their home when the victim got burned and that he did not know how "it happened."
Dr. Faith Hansbrough, a pediatric surgeon, was on duty at the Baton Rouge Medical Center Burn Unit at the time the victim was initially admitted to the hospital, and she attended to the victim for several hours during his initial admission. The victim's hospital stay lasted about eight weeks, during which time skin grafts and other treatments were performed, including the administration of intravenous fluids, daily changes of surgical dressings, and other therapy. At the conclusion of his hospital stay, the victim was released to the custody and care of a public child protection agency. Thereafter, when the victim was released to Elaine's custody, she had to administer daily care to the victim, which included giving him a bath, changing the stockings that he was required to wear, and applying a lotion to the victim's skin. This care was required for about one year.
On August 26, 1988, two days after the victim received his injuries, Baton Rouge City Police Officer Danny Williamson and a fellow officer contacted defendant at Elaine's home. After Williamson orally advised defendant of his Miranda rights, Williamson told defendant that he was being contacted in regard to Michael Buckner, and Williamson asked defendant if he had any knowledge of what had happened to Michael. At that time defendant gave Williamson a statement.
In his statement to Williamson, defendant related that, on August 24, 1988, on the way home after leaving Elaine at her place of employment, Michael defecated in his pants. When he and Michael arrived at home, he told Michael to take a bath. According to defendant, he went outside and began doing yard work, i.e., "weedeating." *299 While outside, he heard Michael hollering. He turned around, noticed Michael at the front door to their home, observed skin hanging from Michael, ran to Michael, telephoned Elaine, and picked Elaine up from work. The two of them then took Michael to the hospital.
Following defendant's August 26, 1988, statement, Williamson spoke to Dr. Hansbrough on October 7, 1988, and two weeks later on October 21, 1988, defendant was arrested for the instant offense and given his Miranda rights. On the day of his arrest after defendant was taken to police headquarters and again advised of his Miranda rights, defendant gave the police a second statement which was substantially similar to the statement he had given on August 26, 1988.
Barbara Cavalier testified that she recalled August 24, 1988, the day Michael received his burn injuries. She was at home that day in her room asleep when defendant, "Buck," called her out of her room. According to Cavalier, hearing defendant calling her was the first thing she heard when she awoke that day. She did not have any other communication with defendant on August 24, 1988. When she went into the bathroom (located nearest to her bedroom), she saw Michael and observed that he had defecated on himself. Cavalier indicated that when she next saw Michael he was in the living room and "that's when he had burns on him." Cavalier stated that she asked the victim who burned him, and he answered: "Buck." At this time, the victim was standing up and moaning. Cavalier denied that she inflicted the victim's burns, stating that she did not "have that type of heart." She stated that when she got up (after defendant called out to her on the morning in question) she did not see anyone in the house other than defendant and the victim.
Dr. Faith Hansbrough qualified and was accepted by the trial court as an expert medical doctor and pediatric surgeon. She identified State Exhibit S-1, seventeen photographs of the victim, as accurately reflecting the victim's condition when she saw him on August 24, 1988. She explained that the pictures were taken within an hour or two of the victim's admission to the hospital and that the pictures show extensive second degree burns and some areas of third degree dermal burn injury. Elaborating, the doctor stated that the body surface area of the victim, which was burned, is not completely revealed in the pictures, but that about 30% of the total body surface area had been burned.
Dr. Hansbrough testified that, when she saw the victim, he was crying and moaning and was nearly in hypovolemic shock. The doctor testified that, as evidenced by the pictures and the victim's condition when she first observed him, the victim was undergoing pain and suffering at that time and that the victim left the hospital in pain. By way of elaboration, Dr. Hansbrough stated that a thermal burn of the degree sustained by the victim is such that, even after the grafting of or growth of new skin over the injury and the passage of many weeks, such a victim would experience a loss of sensation in the area burned, hypersensation in other areas, and a tremendous amount of itching or pain. She further stated that complaints of pain are as frequent after discharge as prior to discharge.
Regarding the victim's condition at the time he was discharged from the hospital, Dr. Hansbrough stated that the victim continued to show evidence of the burn injury itself, which was primarily deepest at the child's lower extremities. The child had early signs of hypertrophy, which is thickening of the skin. Thus, the victim had early signs of scaring and scar contractures. There were raw spots between the interstices of the victim's skin grafts and on his toes and feet. While the child was in a good phase of healing and in a good nutritional state without evident infection at the time of his discharge from the hospital, he continued to be in the early phases of his burn wound recovery.
During the state's presentation of Dr. Hansbrough's testimony, on motion of the state, the victim's mother was permitted to bring the victim into court in order that the jury could view and Dr. Hansbrough could describe the post August 24, 1988, injuries *300 of the victim.[2] In describing these injuries, Dr. Hansbrough pointed out to the jury an area on the victim which she stated fortunately would produce very little functional limitation for the victim. The doctor stated that the victim's limitations are mainly cosmetic. She then pointed out another worse area of scarring which in time may give the victim both functional and cosmetic limitations because the scar will not grow but become thicker. The doctor stated that as the child grows there will be some pull between the hip and the knee, but the most problematic area is the achilles tendon, which is involved in the movement of the foot, leg, and lower extremity. In summary, the doctor stated that the victim has an average cosmetic result and a good functional result with the exception of the areas referenced above.
Dr. Hansbrough opined that, based on her objective findings concerning the burn injury itself, the victim's injury is due to prolonged exposure to hot water through immersion. According to the doctor, it is well-documented in medical literature that, in child abuse cases and burn injury cases, a child will remove himself as quickly as possible from a noxious stimulus. If a child is standing in a cold bathtub[3] and a child turns hot water on himself or even if a child falls into the bathtub and has trouble getting out of the bathtub for several moments or seconds, usually the soles of the child's feet and his buttocks will be spared. In Dr. Hansbrough's opinion, the victim suffered deep second and third degree burn injuries, including injuries to the genitalia and the buttocks, from hot water, which do not imply but prove prolonged exposure in an immersion pattern. Therefore, the doctor opined that the victim's injury was not accidental unless he fell into hot "near boiling" water and was knocked unconscious. Dr. Hansbrough stated that the victim's injury extended to but did not include his rectum. In immersion injuries, the fact that the buttocks were involved without the perineal area usually means there was flexion of the child's hips with some resistance by the child, forceful muscle contractions which close the area off and prevent it from being burned as extensively as the rest of the body. Dr. Hansbrough stated that the victim's injury was consistent with this type closing of the rectum. The doctor stated that she had never read or seen an injury like that of the victim that was reported as sustained by a conscious child or by a child not forcibly held. She stated that the victim's injury could be cited in a textbook as a non-accidental injury. Dr. Hansbrough stated that the victim's injury was not consistent with burns from his getting into a bathtub of drawn water followed by his trying to get out of the bathtub, because a much greater degree of exposure would have been required to produce the depth of burn received by the victim than that which would have resulted from the child getting into the bathtub (unless he was not able to get out of the bathtub). According to the doctor, usually there is plenty of splash and evidence of a vigorous attempt to remove one's self from a noxious stimulus, but, in the instant case, there was no evidence that the victim received a splash injury.
At trial, defendant took the stand in his own defense. Defendant testified that on August 24, 1988, after leaving Elaine at work, he began trying to find Jessie White. White was supposed to install some carpet in the home in which he, Elaine, her two sons, and Cavalier lived. Defendant found White at a vacant lot where he spoke to him. White told defendant that he could not install the carpet that day, but would do the job another day. Defendant and Michael then went back home. Michael told defendant that he had defecated in his pants. Defendant took Michael in the bathroom, removed the child's clothes, and *301 cleaned the child. Defendant then told Michael that later he would bathe him and take him to the baby-sitter. Defendant asked Michael to put on some clothes, sit on the sofa, and watch television, and Michael apparently complied with the request. At this time, Cavalier was in her bedroom.
Defendant testified that before going outside to use "the weedeater," he told Cavalier he would be outside and that the victim was watching television. He asked her to "keep an eye on Michael." In reply, Cavalier indicated that she heard defendant and would do what he had requested.
According to defendant, about ten minutes after he went outside and began "weedeating" around the house, Michael came to the door and called out "Buck" and then "daddy, daddy."[4] Defendant told Michael to go back inside and put on some clothes. Michael replied: "It's hurt. It's hurt." Defendant released the button on the grass trimmer he was using and walked up to the victim. At that time, defendant saw that Michael was burned. Defendant got scared and began crying because Michael's skin was peeling off, and defendant had never seen anything like what he was seeing. Defendant ran, got a sheet, wrapped the child in the sheet and placed him on the couch. Defendant then knocked on the door to Cavalier's room "to get [Cavalier] up." Defendant asked Cavalier if she had heard Michael crying. She answered in the affirmative. He then asked Cavalier why she did not come to see what was wrong with Michael, and Cavalier responded that Michael was always crying.
Defendant testified that he asked Michael what had happened to him, and Michael answered: "the water, the water." At that time, defendant could hear the water running in the bathtub. Defendant initially testified that he burned his hand when he turned off the water, but he later changed this testimony by stating that he burned his hand when he reached into the bathtub and removed "the tile" to drain the bathtub. According to defendant's testimony the water gets hot quickly in that bathtub, and it is the only place in the house that the water gets hot that quickly.[5] When defendant drained the bathtub, he saw Michael's handprint on the wall "like he tried to get out" of the bathtub.
Defendant testified that after he telephoned Elaine to tell her Michael had been badly burned and before he went to get her, he told Cavalier to stay with the victim until he and Elaine returned. When he and Elaine got home, they immediately took Michael to the hospital arriving there in about ten to fifteen minutes.
Defendant testified that nothing happened on the morning in question that made him angry or upset and that nothing could have made him get angry enough to hurt Michael. More specifically, defendant stated that Michael's defecating in his pants did not upset him. Prior to the incident, he and Michael had had a very good relationship, and Michael referred to him as daddy. Defendant further stated that he did not know who would want to burn Michael, that he did not think Cavalier did it, and that no one besides Cavalier was in the house at the time Michael was burned.
In regard to Officer Williamson's testimony that in defendant's statement to the police defendant stated that on the day in question he told Michael to take a bath, defendant testified that Williamson might have misunderstood him. Defendant testified that he never told Michael to take a bath.
Elaine testified that Michael had turned faucets on once in the past. However, she explained that when Michael turned on the faucets he was not taking a bath but was supposed to be "using the bathroom;" and he turned them on from the outside of the bathtub. Elaine stated that the faucets could be turned on easily. She usually gave Michael his bath, and she drew the water for his bath while he remained outside the bathtub. She never allowed Michael to take a bath by himself.

*302 ASSIGNMENTS OF ERROR NOS. ONE THROUGH FIVE AND NINE:
By means of these assignments, defendant essentially argues that the evidence was insufficient to prove beyond a reasonable doubt all the elements of cruelty to a juvenile to the exclusion of the reasonable hypothesis of innocence that the victim's injuries were accidental.
Initially, we note that the record does not reflect that defendant filed a motion for post-verdict judgment of acquittal. In order to challenge a conviction on the basis of insufficiency of the evidence, defendant should have proceeded by way of a motion for post-verdict judgment of acquittal. See LSA-C.Cr.P. art. 821. Nevertheless, we will consider a claim of insufficiency of the evidence which has been briefed pursuant to formal assignment of error.
In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That standard is that the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. State v. Captville, 448 So.2d 676, 678 (La.1984). The standard has been codified in LSA-C.Cr.P. art. 821.
When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 mandates that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This statutory test is not a purely separate one from the Jackson constitutional sufficiency standard. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. State v. Rosiere, 488 So.2d 965, 968 (La.1986).
LSA-R.S. 14:93 A provides:
Cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child's age shall not be a defense.
Defendant argues that the state failed to prove his specific intent to commit cruelty to a juvenile. However, contrary to defendant's assertion that specific intent is a requisite element of cruelty to a juvenile, the term "intentional" as used in LSA-R.S. 14:93 refers to general criminal intent, "present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." LSA-R.S. 14:10(2). See State v. Sumler, 395 So.2d 766, 769 (La. 1981); State v. Spencer, 486 So.2d 870, 874 (La.App. 1st Cir.1986). Thus, LSA-R.S. 14:93 requires only a general criminal intent to mistreat or neglect and not a specific intent to cause the child unjustifiable pain and suffering. State v. Barnett, 521 So.2d 663, 665 (La.App. 1st Cir.1988). As an alternative to proving that an accused intentionally mistreated or neglected a child, LSA-R.S. 14:93 permits the state to prove the accused was criminally negligent in his mistreatment or neglect of the child. See State v. Green, 449 So.2d 141, 144-145 (La.App. 4th Cir.1984). LSA-R.S. 14:12 defines criminal negligence as follows:
Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
Defendant's trial testimony essentially presented a version of events through which he emphatically denied committing the instant offense and suggested as a reasonable hypothesis of innocence that the *303 victim had accidentally injured himself. The jury viewed defendant's appearance and demeanor when he testified, and its verdict indicates that it found defendant's testimony was not credible. Therefore, the jury gave defendant's testimony no weight and rejected it. Defendant suggests on appeal that the jury gave undue weight to Dr. Hansbrough's testimony. However, a determination of the weight to be given evidence is a question of fact for the trier of fact, not subject to appellate review. State v. Tate, 506 So.2d 546, 551 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (La. 1987).
When a case involves circumstantial evidence, and the trier of fact reasonably rejects the hypothesis of innocence presented by defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Captville, 448 So.2d at 680; State v. Guirlando, 491 So.2d 38, 41 (La.App. 1st Cir.1986). The jury's verdict reflected a reasonable construction of the events which gave rise to the victim's injuries based upon the evidence viewed in the light most favorable to the state. The evidence clearly ruled out any theory of accidental infliction of the victim's injuries, and there is no other hypothesis which raises a reasonable doubt as to defendant's guilt. The state's evidence established that, at the time of the instant offense, the victim was three years old and defendant was over seventeen years old. The victim received burns over about 30% of his body, including second degree and third degree burns. Through the expert opinion testimony of Dr. Hansbrough concerning the nature of the victim's burn injuries, her testimony concerning the pain and suffering resulting from such injuries, and S-1, the photographs of the victim's injuries, it was clearly established that the victim was subjected to unjustifiable pain and suffering.
Viewing all of these circumstances together with the victim's statement to Cavalier indicating that defendant burned him and the various circumstances articulated by Dr. Hansbrough as to the basis for her expert opinion that the victim's injuries were not accidentally or self-inflicted, any rational trier of fact could have concluded beyond a reasonable doubt that defendant intentionally or through his criminal negligence committed cruelty to a juvenile.
These assignments lack merit.

ASSIGNMENTS OF ERROR NOS. SIX AND SEVEN:
In assignment six, defendant claims that the trial court denied him an opportunity to cross-examine Elaine regarding her knowledge of defendant's care and the treatment of the victim, her efforts to aid defendant in requesting the district attorney to dismiss the instant charge, and the fact that her testimony was influenced due to a threat to remove the victim from her custody if she "saw" defendant or aided him in any way in the conduct of his trial. In assignment seven, defendant asserts that defense counsel was prohibited from arguing an objection and laying a foundation for the purpose of impeaching Elaine's testimony or questioning her credibility due to outside influences.
The record reflects that, in response to defense counsel's cross-examination, Elaine gave testimony that defendant had a good relationship with the victim and showed a fondness for the child and loved the child and that the child in turn showed fondness for defendant and wanted to go with him everywhere he went. Elaine further testified that defendant visited the victim with her while the victim was in the hospital until hospital personnel told defendant not to return during her future visits. After Elaine testified that the victim does refer to defendant as "Buck," defense counsel asked Elaine if the child shows affection toward defendant. At this juncture, the trial court sustained the state's relevancy objection to the above question without any defense objection to the trial court's ruling. After the resumption of cross-examination, the defense elicited Elaine's testimony that, on the morning of August 24, 1988, immediately prior to leaving her at work, defendant did not seem to be upset or angry with the victim. Elaine also testified that she had no knowledge *304 that defendant was upset or angry with anyone that day. The following line of questioning occurred:
Q What is the temperament of Joseph Morrison?
A I didn't understand what you are talking about.
Q All right, have you lived with him for a period of time?
A Uh-huh.
Q Have you
Thereupon, this line of questioning was interrupted by the state's relevancy objection which was sustained by the trial court without any defense objection to the ruling. By failing to object to the rulings sustaining the state's objection to examination of the witness, defense counsel acquiesced in the rulings and thereby waived any objection to them. See State v. Huizar, 414 So.2d 741, 749 (La.1982); State v. Brown, 504 So.2d 1086, 1088 (La.App. 1st Cir.1987).
When cross-examination resumed, Elaine stated that she knew of nothing which would have caused defendant to mistreat the victim and that defendant had never mistreated the child in her presence. Thereupon, defense counsel asked Elaine if she had requested the district attorney not to proceed in this case. The state objected to defense counsel's question as irrelevant. The trial court sustained the objection. Defense counsel objected to the ruling, but attempted no further cross-examination of Elaine. We concur in the trial court's ruling in that whether or not Elaine had asked the prosecution not to proceed with this case was clearly irrelevant. See LSA-C.E. arts. 401 and 402.
After carefully reviewing the entirety of defense counsel's cross-examination of Elaine, we find that there was no abridgement of defendant's constitutional right to confront and cross-examine this witness. Accordingly, these assignments lack merit.

ASSIGNMENT OF ERROR NO. EIGHT:
By means of this assignment, defendant contends that the testimony of Barbara Cavalier repeating the victim's response to her question (concerning who had burned him) was hearsay testimony admitted without corroborating evidence.
During Barbara Cavalier's direct examination, she testified, without objection, that, when she spoke to the victim on the morning of August 24, 1988, and asked him who burned him, the victim answered: "Buck." By failing to enter any contemporaneous objection to the alleged erroneous admission of Cavalier's testimony repeating the victim's response to her, defendant failed to preserve the alleged error on appeal. See LSA-C.Cr.P. art. 841 and LSA-C.E. art. 103(A)(1). In any event, we find that the testimony repeating the victim's answer was admissible since the answer was part of the res gestae and, thus, not hearsay. See LSA-C.E. art. 801D(4). The testimony was also admissible as an exception to the hearsay rule since the answer constituted an excited utterance of the victim. See LSA-C.E. art. 803(2).
This assignment lacks merit.

ASSIGNMENT OF ERROR NO. TEN:
By means of this assignment, defendant argues that the trial court erred by imposing an excessive sentence and failing to follow the sentencing guidelines contained in LSA-C.Cr.P. art. 894.1. He submits that his sentence should be vacated as excessive and that the case should be remanded to the trial court for reconsideration of a lesser sentence with probation.
Article 1, § 20, of the Louisiana Constitution prohibits the imposition of excessive punishment. Excessiveness of a sentence is a question of law which is reviewable. See State v. Sepulvado, 367 So.2d 762, 764 (La.1979). A sentence may be excessive either by reason of its length or because the circumstances warrant a less onerous sentencing alternative. State v. Tate, 506 So.2d at 552. In other words, a sentence may be both within the statutory limits and constitutionally excessive. State v. Sepulvado, 367 So.2d at 767. A sentence is excessive when it is grossly out of proportion to the severity of the offense or nothing more than the needless and purposeless *305 imposition of pain and suffering. To determine whether or not a penalty is grossly disproportionate to the crime, the court considers the punishment and the crime in light of the harm to society and whether or not the penalty is so disproportionate as to shock our sense of justice. State v. Bonanno, 384 So.2d 355, 358 (La. 1980). Because of the wide discretion afforded the trial court in imposing sentence, a sentence within statutory limits will not be set aside as excessive in the absence of a manifest abuse of discretion. State v. Orgeron, 512 So.2d 467, 470 (La.App. 1st Cir.1987), writ denied, 519 So.2d 113 (La. 1988).
A trial court's reasons in imposing sentence, as required by LSA-C.Cr.P. art. 894.1, are an important aid to this Court when reviewing a sentence alleged to be excessive. State v. Christy, 509 So.2d 829, 831 (La.App. 1st Cir.), writ denied, 513 So.2d 296 (La.1987). The trial court need not recite the entire checklist found in LSA-C.Cr.P. art. 894.1. However, the record must reflect that the court adequately considered the guidelines. State v. Davis, 448 So.2d 645, 653 (La.1984). Even when the trial court has not complied with LSA-C.Cr.P. art. 894.1, this court need not remand the case for resentencing unless the sentence imposed is apparently severe in relation to the particular offender or the offense committed. State v. Carr, 530 So.2d 579, 592 (La.App. 1st Cir.), writ denied, 533 So.2d 354 (La.1988), cert. denied, 489 U.S. 1098, 109 S.Ct. 1573, 103 L.Ed.2d 939 (1989).
Cruelty to a juvenile is punishable by imprisonment with or without hard labor for a maximum of ten years and/or a maximum fine of one thousand dollars. LSA-R.S. 14:93 D. Herein, defendant was sentenced to imprisonment at hard labor for a term of nine years, and no fine was imposed.
In this case, the trial court ordered a presentence investigation report. At the beginning of defendant's sentencing hearing, defense counsel noted that (as reflected by the presentence investigation report) the instant conviction was defendant's first criminal conviction. In further comments, defense counsel noted defendant had been out on bond for in excess of a year and had not been having contact with the victim. Noting that defendant continued to maintain his innocence of the instant offense, defense counsel concluded his remarks by asking the trial court to be merciful in imposing sentence.
In articulating its reasons for sentencing, the trial court noted that although defendant had maintained his innocence throughout these criminal proceedings, the jury had convicted defendant. After reviewing the particular facts brought out through evidence presented at trial, the court stated that it did not believe defendant's exculpatory version of the facts concerning the victim's injuries. Noting that the victim had received burn injuries to approximately 30% of his body, including second and third degree burns, the court opined that the infliction of such injuries to a helpless (less than) four-year-old child was particularly offensive. The court acknowledged as a mitigating factor that defendant had no prior criminal convictions on his record, with the exception of several arrests that had occurred many years ago. Referring to the sentencing provisions of LSA-C. Cr.P. art. 894.1, the court stated that it found that the victim had suffered needlessly because of defendant's actions and anger displayed as a result of the child having had a bowel movement. Noting the violent nature defendant exhibited in response to the child's soiling his clothing, the court stated that there was an undue risk that during any type of suspended sentence or probation defendant would commit another similar crime. In that regard, the court also noted that, although defendant had been out of jail on bond for a year without being involved in an incident of a similar nature, defendant had not been in touch with the victim. In imposing the instant sentence, the court further stated that defendant was in need of correctional treatment or a custodial environment which could best be provided by his commitment to a correctional institution. In emphasizing the severity of the injuries sustained by *306 the child, the court concluded that a lesser sentence would deprecate the seriousness of this particular offense.
In our view the trial court adequately complied with the sentencing guidelines contained in LSA-C.Cr.P. art. 894.1. We cannot say that the sentence imposed is excessive under these circumstances. The record reflects that the trial court considered the range of sentencing alternatives and individualized the sentence to the particular defendant for the particular crime involved. This assignment lacks merit.

CONCLUSION
As we have found that all of defendant's assignments of error lack merit, we affirm defendant's conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The testimony of Elaine Buckner, the victim's mother, established that the victim was born on March 17, 1985.
[2] When the state made its motion, the trial court asked defense counsel if he had any objection to having the jury view the injuries and the doctor describe the injuries, and defense counsel answered in the negative. At that point, the mother and child were allowed to enter the courtroom.
[3] According to Dr. Hansbrough, almost all bathtubs are cold even in the summertime or in a warm room.
[4] Elaine Buckner testified that the victim referred to defendant only as "Buck."
[5] Elaine Buckner testified that there were two bathrooms in the residence.