835 So.2d 623 (2002)
STATE of Louisiana
v.
Kenisha DUNCAN
No. 2002 KA 0509.
Court of Appeal of Louisiana, First Circuit.
September 27, 2002.
*625 Hon. Walter P. Reed, District Attorney, Covington, Dorothy A. Pendergast, Special Appeals Counsel, Metaire, for the State of Louisiana.
Frederick Kroenke, Baton Rouge, for Defendant-Appellant Kenisha Duncan.
Before: FITZSIMMONS, GUIDRY, and PETTIGREW, JJ.
PETTIGREW, J.
Kenisha Duncan was indicted by a grand jury for the second degree murder of her daughter, Chantell Duncan, on December 19, 2000, in violation of La. R.S. 14:30.1. The defendant pled not guilty. The indictment was later amended to provide that the killing occurred between December 17, 1996 and December 18, 2000. Immediately prior to trial, the State again amended the indictment to provide that the acts occurred between September 3, 1997 and December 18, 2000, explaining that September 3, 1997, was the date the defendant turned 17 years old.
Following a jury trial, the defendant was found guilty as charged. The defendant subsequently filed a motion for new trial, a motion for post verdict judgment of acquittal, and a motion in arrest of judgment, all of which were denied by the trial court. Thereafter, the trial court sentenced the defendant to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.
The defendant appeals her conviction, arguing that the evidence was insufficient to support her conviction and that the trial court erred in allowing the State to amend the indictment and to introduce evidence of prior acts of abuse and neglect in violation of La.Code Evid. art. 404(B). For the reasons that follow, we affirm.

FACTS
On December 18, 2000, Kevin Katz of the St. Tammany Parish Fire District responded to a 9-1-1 call. When he arrived at the location, he saw two houses: a small, shotgun-style cottage, and a larger home. A man walking between the two houses gestured toward the larger house. Katz saw a woman sitting in a large, open window in the larger house. Katz testified the woman did not seem upset in any way. He entered the home through the open window and saw a very small child lying in a bed on the far side of the room. Katz noticed the child had on lightweight, spring clothing.
Upon Katz checking the child for a heartbeat and finding none, he placed the child, who appeared to be an infant because of her size, on the floor to begin performing CPR. Katz testified that he could feel the child was extremely cold to the touch, even through his latex gloves. The child was soon placed in an ambulance, where paramedics attempted to resuscitate her. Katz testified that throughout the incident, he did not see the mother of the child (the same woman he had seen sitting in the window) show any emotion at all, nor did he see her ask anyone how the child was doing.
*626 Officer Henry Marquez, Jr. testified that he also responded to the 9-1-1 call. When he asked the defendant what happened, she told him that she had come to the front cottage last night, but her father was not home; so she got the keys to the larger house and took her daughter there to spend the night. They woke up the next morning and ate eggs and grits, and then went back to bed. Officer Marquez additionally testified the defendant told him that around 9:00 a.m., she woke up to find her daughter laying on the floor unresponsive; so she picked her up, put her on the bed, and called 9-1-1. Officer Marquez noted that it was extremely cold that morning; and that the defendant was calm, cordial, and not upset while the paramedics were working on her daughter.
The child was taken by ambulance to the St. Tammany Parish Hospital. Detective Jobeth Rickels was at the hospital where she interviewed the defendant. Detective Rickels testified that the defendant was not emotional, did not ask about the condition of her child, and did not ask to see the child. After being advised of her rights and signing a waiver of rights form, the defendant answered Detective Rickels' questions.
Detective Rickels testified that the defendant told her she and Chantell had been to Mississippi the day before to visit with relatives and celebrate Chantell's birthday. Chantell had turned four years old on December 17. When they came back home that night, the cottage where they lived with the defendant's father was locked; so they went to the larger house in the rear to spend the night. The defendant also told Detective Rickels they woke up the next morning, ate eggs and grits for breakfast, and then went back to sleep. According to the defendant, she awoke later to find Chantell on the floor.
According to Detective Rickels, the defendant told her that she would often tie Chantell's wrists and ankles together with plastic electrical ties to make her be still; that she would make her stand tied up in the corner, that she had put a belt around her neck; and that she would discipline her with a switch, her hand, or a belt. Detective Rickels testified that the defendant told her that her father, with whom they lived, would also punish Chantell; and that she and her father were the only individuals who disciplined the child.
Dr. Scott Benton testified that Chantell was brought to Children's Hospital on the afternoon of December 19, 2000. According to Dr. Benton, Chantell arrived in critical condition because of multi-system organ failure. Chantell had a core body temperature of 80.2 degrees. Although Chantell had just turned four years old, her body mass and body weight was that of a much younger child. The absence of buttock fat and buttock muscle supported Dr. Benton's conclusion that Chantell was suffering from starvation. The child had poor hygiene, dirt in her hair, and smelled bad. Dr. Benton noted she had significant edema in the face, abdomen, legs, and extremities as a result of her systems not functioning properly, because of hypothermia and "significant starvation."
Dr. Benton also testified about numerous injuries to Chantell's body, which could only have resulted from abuse. Dr. Benton testified Chantell had bruising on her face and multiple fresh, healing, and healed injuries all over her body, many of which were in a looped scar pattern. The looped scar pattern, in Dr. Benton's opinion, was indicative of Chantell having been beaten or whipped with an extension cordsomething that Dr. Benton had come across in other child abuse cases. Chantell also had scars all over her body. Some scars were fresh, some were healing, *627 and some had already healed. Dr. Benton testified that Chantell's scars were so numerous that he had to draw diagrams of their location rather than document them in a written description.
Dr. Benton also found ligature injuries on the child's wrists and ankles, all in different stages of healing. X-rays revealed fractures to Chantell's hand and foot, and a traction in her upper arm, which Dr. Benton described as a "twisting-type" injury that occurs where the muscle has been stripped off the bone as a result of grabbing and twisting that area. Dr. Benton additionally testified he believed Chantell's condition indicated she had suffered pain unjustifiably.
Despite the doctors' best efforts, Chantell died hours later. Dr. Benton testified that although her core temperature of 80.2 degrees was low enough to cause death by itself, Chantell's death was also the result of "significant starvation," which contributed to the multi-system organ failure.
Lieutenant Jim Richard also testified about Chantell's physical condition prior to her death. Like Dr. Benton, he saw numerous looped-style bruises and injuries on her arms, chest, legs, and back in different stages of healing. Lieutenant Richard also noted a contusion to Chantell's forehead and lacerations to her wrists and ankles, which indicated she had been bound. Lieutenant Richard additionally testified that although it was freezing outside that morning, Chantell had been found and brought to the hospital in a sleeveless shirt and shorts.
Lieutenant Richard assisted with a search of the cottage. He testified the defendant showed him a toolbox where she and her father kept the plastic ties. He also saw a large hole in the roof of one of the bedrooms through which freezing air, debris, and rain entered the cottage. This room was adjacent to a bathroom that, Lieutenant Richard noted, had a lock on the outside of the door, which could be used to lock the bathroom from the outside. The door between the room with the hole in the roof and the bathroom was jammed, so that it could not be entirely shut, but it also could not be opened any further. While there was a space heater in the bathroom, it was surrounded by trash such that, in Lieutenant Richard's opinion, it could not have been used recently. The entire house was covered in dishes, pots, trash, plates of half-eaten food, clothing, and plastic twist ties, which, although cut, had originally been in a tiny, circular shape. In Lieutenant Richard's opinion, it was around 30 degrees on the morning that the defendant called 9-1-1. Captain Tim Lentz, another officer involved in the investigation, testified that the weather service listed the temperature on the morning of December 18 as 28 degrees.
Dr. Michael V. DeFatta, the Chief Deputy Coroner of St. Tammany Parish, testified about Chantell's autopsy. Despite her age, Chantell weighed only 25 pounds and was, according to Dr. DeFatta, very malnourished. He noted loop marks "pretty much all over her entire body," which were in different stages of healing. Dr. DeFatta also found fresh, healing, and scarred abraded marks around Chantell's wrists and ankles, indicating she had been bound numerous times. Dr. DeFatta noted that the victim had loop marks on the sides of her torso and defensive injuries on her arms that showed Chantell was tied up and unable to defend herself during some of the beatings. Dr. DeFatta testified the nature of the ligature injuries and scars showed Chantell struggled while tied up.
Chantell also had other bruises, scars, and lesions. She had bruised areas on her shoulder, pressure sores, and lacerations to her foot. She had bruising to her forehead, *628 left side of the face, and the right side of the neck, with significant hemorrhage in the tissue underneath, indicating the wounds could not have been self-inflicted. A large portion of her hair was missing from her scalp and had been pulled out traumatically. Dr. DeFatta found areas of trauma or impact, revealed by hemorrhage, in the chest, back, and abdomen, some of which were hours old, some days old, and some weeks old. Chantell also had pneumonia.
According to Dr. DeFatta, hypothermia is caused by immersion in cold water or exposure to the elements that leads to a dropping of body temperature, arrhythmia, and then death. In his opinion, Chantell was unable to seek warmth because she was tied up, locked up, or incapacitated, or unconscious from head trauma. Dr. DeFatta testified Chantell obviously was a battered child who was not being fed properly. As a result of the battered child syndrome and the malnutrition, she was predisposed, in Dr. DeFatta's opinion, to die from the hypothermia because of her weakened condition and because of her inability to seek out warmth.
Kenisha Duncan testified on her own behalf. She testified that only her father would bind and abuse Chantell. She indicated that she "couldn't count" the number of times her father had bound Chantell with plastic twist ties and made her stand in a corner. The defendant acknowledged that she would whip her daughter for misbehavior and noted that her father would also "whoop" and discipline Chantell. She also testified she was aware there were a lot of marks on Chantell, that she was home almost all of the time, and that her father would discipline Chantell in the bedroom.
The defendant testified she initially lied to the police when she told them the story about sleeping in the big house. Instead, according to the defendant, she fell asleep on the sofa under a comforter while her daughter was sitting on the floor of the bedroom watching television and wearing a large sweatshirt. Her father woke her up the next morning and told her Chantell was freezing and they needed to call 9-1-1. Although the defendant initially testified Chantell was not tied up in the sweatshirt when the defendant fell asleep on the couch, she later admitted Chantell was tied up in the sweatshirt.
The defendant admitted that she originally told police she was the one who bound and beat her daughter because she wanted to protect her father; but later, after she was charged with murder, she decided to tell the truth. The defendant also noted that she moved away from her father two times to live with other relatives, when Chantell was younger, but voluntarily chose to move back in with her father and continue a sexual relationship with him.
Social worker Terrilynn Bowe testified during the State's rebuttal. She indicated that she spoke with the defendant on December 19th after she had been arrested. The defendant admitted to her that she had told the police that she had gone to Mississippi, but that it was not true. Bowe testified the defendant told her that Chantell had always been a bad child and that she and her father had to tie Chantell's hands and feet so she would stay in timeout. The defendant also told Bowe that her father had tried putting a belt around Chantell's neck to restrain her, but that did not work so she or her father would place Chantell in an adult-sized shirt and tie the arms behind her back. Bowe testified the defendant also told her that she used a switch or belt to discipline Chantell and that she was aware her father used a looped electrical cord to whip Chantell. The defendant also told Bowe *629 that Chantell was frequently placed tied-up in a corner of the bedroom in a space formed by the edges of two dressers, sometimes while the defendant and her father were having sex in the same room.

ANALYSIS

I. Sufficiency of the Evidence
In her first assignment of error, the defendant asserts the evidence at trial was insufficient to show that she was the perpetrator of any abuse or neglect of her daughter. As such, the defendant argues the evidence at trial was insufficient to convict her of second degree murder. Specifically, the defendant argues the victim died from hypothermia and not from abuse or starvation and that there was no evidence to show it was the defendant who rendered the victim unconscious, locked her in a room, or tied her up so she could not reach an area of warmth that night.
The defendant was convicted of second degree murder in violation of La. R.S. 14:30.1. That statute provides, in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
. . . .
(2)(b) When the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm.
Cruelty to juveniles is defined in La. R.S. 14:93(A) as the "intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child." The term "intentional" as used in La. R.S. 14:93 refers to general criminal intent to mistreat or neglect and does not require an intent to cause the child unjustifiable pain and suffering.[1]State v. Morrison, 582 So.2d 295, 302 (La.App. 1 Cir.1991). "Mistreatment" as used in this statute is equated with "abuse." State v. Comeaux, 319 So.2d 897, 899 (La.1975). Criminally negligent mistreatment or neglect of the juvenile occurs where there is such disregard of the interest of the juvenile that the defendant's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. State v. Morrison, 582 So.2d at 302; La. R.S. 14:12.
Thus, in order for the State to prove the defendant was guilty of the second degree murder where the killing occurred during the perpetration of cruelty to a juvenile, it had to establish either that (1) the defendant intentionally mistreated or neglected Chantell, resulting in the infliction of unjustifiable pain or suffering, and, ultimately, death; or (2) that the defendant was criminally negligent in her mistreatment or neglect of Chantell, causing the infliction of unjustifiable pain or suffering, and finally, her death. The trial court also instructed the jury on the law concerning principals to a crime as follows: "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the *630 crime, are principals." La. R.S. 14:24. Thus, the jury had a basis for convicting the defendant even if they found she did not personally participate in the acts of cruelty to or neglect of Chantell that led to her weakened condition or that occurred on the night before her death.
In reviewing the sufficiency of the evidence to support a conviction, an appellate court is governed by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court must determine the evidence, when viewed in the light most favorable to the prosecution, was sufficient to convince any rational trier of fact that all the elements of the crime and the defendant's identity as the perpetrator of that crime had been proven beyond a reasonable doubt. State v. Harris, 97-0778 (La.3/4/98), 708 So.2d 387, 388.
"Circumstantial evidence consists of the proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." State v. Porter, 99-1722, p. 15 (La.App. 3 Cir. 5/3/00), 761 So.2d 115, 123. When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." As noted by the supreme court in State v. Ortiz, 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998), "[t]his is not a separate test to be applied when circumstantial evidence forms the basis of a conviction; all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt." In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Porter, 99-1722 at 16, 761 So.2d at 123-24.
Moreover, the trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. When there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter goes to the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review, and the appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. State v. Savario, 97-2614, pp. 7-8 (La.App. 1 Cir. 11/6/98), 721 So.2d 1084, 1089, writ denied, 98-3032 (La.4/1/99), 741 So.2d 1280; State v. Taylor, 97-2261, pp. 5-6 (La.App. 1 Cir. 9/25/98), 721 So.2d 929, 932.
The defendant's statements given after her daughter was taken to the hospital, as well as her testimony at trial, contained sufficient inconsistencies such that the jury could have determined that she was not credible. In any case, the defendant testified at trial that she was aware her father would tie up Chantell, that they both would "whip" Chantell, that she was aware of the marks on Chantell, and that her father would discipline Chantell in the bedroom. Detective Rickels testified the defendant told her she would tie Chantell's wrists and ankles, make her stand in a corner, put a belt around her neck, and discipline her with a switch. Detective *631 Rickels also testified the defendant told her she was aware her father would also punish Chantell. Lieutenant Richard testified the defendant showed him the toolbox where she and her father kept the plastic ties they used to tie up Chantell. Terrilynn Bowe testified the defendant had told her that she and her father would tie up Chantell's hands and feet, that the defendant's father had put a belt around Chantell's neck to restrain her, that her father would tie Chantell up in an adult-sized sweatshirt, that she would beat Chantell with a switch, and that her father would whip Chantell with a looped electrical cord.
Dr. Benton testified Chantell suffered from starvation and that this contributed, along with the hypothermia, to multi-system organ failure. Dr. DeFatta testified that starvation and battered child syndrome caused Chantell to have a weakened condition that predisposed her to die from the hypothermia and, perhaps, caused her to be unable to seek out warmth because she was locked up, tied up, or unconscious due to head trauma or the starvation and child abuse.
Viewing the evidence in the light most favorable to the prosecution, it is clear that any rational trier of fact would have concluded the State proved beyond a reasonable doubt that the defendant either: (1) was personally responsible for or was principal to the intentional mistreatment or neglect of Chantell, causing her unjustifiable pain and suffering, resulting in her death, or (2) disregarded Chantell's interests to such an extent that her conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under the circumstances, resulting in unjustifiable pain, suffering, and death to Chantell.
In her short life, this child, who turned four only several hours prior to her death, was repeatedly bound hand and foot, beaten numerous times with an electrical cord and other implements, and starved of food, love, and affection. According to the defendant's own statements to others and at trial, Chantell suffered immensely at the hands of the defendant, and at the hands of her grandfather, with the defendant's consent, acquiescence, and participation. Chantell was emaciated and had recent injuries, some of which the coroner found to be only hours old. We may never know if Chantell was unable to find a warm place in the cottage that night because she was tied up, locked in the bathroom, or incapacitated due to her physical condition or physical trauma caused by another. It was reasonable, however, given Chantell's emaciated condition, which must have been caused by a lengthy period of starvation, the wounds to her body too numerous to count and in various stages of healing, and the defendant's own testimony and statements to others that she participated and acquiesced in the abuse of Chantell, for the jury to conclude that Chantell's death was a direct result of the defendant's intentional abuse or criminal neglect of Chantell, resulting in her unjustifiable pain, suffering, and death.
This assignment of error lacks merit.

II. Motion to Quash
The original indictment charged the defendant with second degree murder of Chantell occurring on December 19, 2000. One month prior to trial, the State amended the indictment to provide that the crime took place "between 12/17/96 and 12/18/2000," the dates of Chantell's birth and death. The defendant filed a motion to quash the indictment or to strike the amendment. The defendant argued below that the amendment could only have been made by a grand jury and that the State was attempting to evade the requirements *632 of La.Code Evid. art. 404(B) and State v. Prieur, 277 So.2d 126 (La.1973) by improperly making prior acts of abuse an element of the crime charged. The trial court rejected those arguments, finding that the State could amend the indictment without return to a grand jury because the particular date of the offense was not an essential element of the crime. The court also implied that the incidents of prior abuse were "alleged acts" in the indictment and did not fall under the dictates of Prieur. The court further noted that the defendant had open file discovery and notice before trial of the "alleged acts" that would be at issue.
In brief to this court, the defendant argues the trial court erred in denying defendant's motion to quash because the amendment allowed the State to introduce evidence of prior acts of abuse of Chantell by the defendant in violation of La.Code Evid. art. 404(B) and Prieur. The defendant fails to recognize, however, that Article 404(B)(1)'s limitations on the admissibility of "other crimes, wrongs, or acts" evidence applies exactly to that other crimes, wrongs, or actsand not to the crime charged. Indeed, relevant and probative evidence necessary to establish the elements of the crime charged is not rendered inadmissible because it also constitutes evidence of other criminal acts. State v. Anderson, 343 So.2d 135, 138 (La. 1976). Furthermore, notice required under La.Code Evid. art. 404(B)(1) and under State v. Prieur is not mandated when the evidence relates to "conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding." La.Code Evid. art. 404(B)(1); State v. Prieur, 277 So.2d at 130 ("No such notice is required as to evidence of offenses which are a part of the res gestae ....").
Herein, the defendant was charged with second degree murder in violation of La. R.S. 14:30.1. Under subsection (2)(b) of that statute, the State could attempt to prove the killing of Chantell took place while the defendant was engaged in (or a principal to) the perpetration of cruelty to juveniles, even though she had no intent to kill or inflict great bodily harm. Under La. R.S. 14:93(A), "cruelty to juveniles" is the intentional or criminally negligent mistreatment or neglect of a child whereby unjustifiable pain or suffering is caused to the child. In the instant case, the State's position, supported by the testimony of Dr. DeFatta, was that years of abuse, mistreatment, and starvation by the defendant herself, or in concert with her father, cumulatively caused the victim's weakened condition and left her especially susceptible to hypothermia. This conclusion was buttressed by the obvious fact that the defendant did not suffer any effects from hypothermia despite having slept in the same house as the victim on that cold night. As such, the individual acts of cruelty, neglect, and mistreatment are a necessary element of the crime charged as they were alleged to have contributed to the victim's unnecessary death.
The trial court did not err in denying the defendant's motion to quash the amendment to the indictment on these grounds. This assignment of error lacks merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] General criminal intent is "present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." La. R.S. 14:10(2).