STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT


06-167


STATE OF LOUISIANA

VERSUS

TIMOTHY E. ROBERTSON


OPINION ON REMAND FROM THE LOUISIANA SUPREME COURT


**********

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 04-575
HONORABLE ALLEN A. KRAKE, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Michael G. Sullivan, Judges.

                                        AFFIRMED AND REMANDED.


**James Patrick Lemoine**
**District Attorney - Parish of Grant**
**James D. White, Jr.**
**Assistant District Attorney - Parish of Grant**
**P. O. Box 309**
**Colfax, LA 71417**
**Telephone:  (318) 627-3205**
**COUNSEL FOR:**
        **Plaintiff/Appellee - State of Louisiana**

**Richard Emile deVargas**
**506 Front Street**
**Natchitoches, LA 71457**
**Telephone:  (318) 354-8222**
**COUNSEL FOR:**
  **Defendant/Appellant - Timothy E. Robertson**

**THIBODEAUX, Chief Judge.**

Our original opinion[1] was affirmed in part and reversed in part by the Louisiana Supreme Court. The supreme court affirmed our decision to reverse the Defendant's conviction for "Creation or operation of a clandestine laboratory for the unlawful manufacture of CDS II, in violation of La.R.S. 40:983(A)(3); second offender, in violation of La.R.S. 40:982" because it constituted a non-crime. Louisiana Revised Statutes 40:982 is a post-conviction *enhancement* statute. It reversed our decision to invalidate the entire conviction and not merely the erroneous portion. The supreme court further concluded that the trial error of placing prior crimes in a bill of information was subject to a harmless error analysis and, in this case, the error was harmless. The supreme court later granted a rehearing for the "limited purpose of transferring this case to the Third Circuit Court of Appeal for their consideration of the assignments of error previously assigned by defendant to the court of appeal and pretermitted by the court of appeal." *State v. Robertson*, 06-1537 (La. 1/16/08), ___ So.2d ___, (*reh'g granted* 3/14/08).

For the following reasons, we affirm the Defendant's conviction for the lesser-included offense of Creation or operation of a clandestine laboratory for the unlawful manufacture of CDS II, to-wit, Methamphetamine and remand to the trial court for sentencing.

I.

**ISSUES**

Consistent with our Louisiana Supreme Court's remand instruction, we shall consider whether:

---

[1]*State v. Robertson*, 06-167 (La.App. 3 Cir. 5/31/06), 931 So.2d 523.

(1) the evidence presented at trial is insufficient to sustain a conviction for Creation or operation of a clandestine laboratory for the unlawful manufacture of CDS II, to-wit, Methamphetamine;

(2) the trial court erroneously denied Defendant's Motion to Suppress;

(3) the trial court erroneously allowed the introduction of "other crimes" evidence; and,

(4) the trial court erroneously allowed the State to introduce the transcript of Defendant's previous guilty plea after the State had closed its case in chief.

II.

## LAW AND DISCUSSION

### Insufficiency of the Evidence

Defendant contends the evidence presented at trial was insufficient to support his conviction in that there was no proof of intent. Specifically, he notes some components needed for the production of methamphetamine, namely, anhydrous ammonia, muriatic acid, and denatured alcohol, were not present at the residence. Additionally, Defendant points out that his fingerprints were not found on the seized items. Finally, Defendant argues there was no evidence proving he was in constructive possession of these items. A ruling that the evidence is insufficient would necessitate an acquittal; thus, we have addressed this assignment of error first pursuant to *State v. Hearold*, 603 So.2d 731 (La.1992).

In *State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371, this court set forth the standard of review to be used by appellate courts in addressing a sufficiency review:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most

2

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

Louisiana Revised Statutes 40:983 provides in pertinent part:

A. Creation or operation of a clandestine laboratory for the unlawful manufacture of a controlled dangerous substance is any of the following:

(1) The purchase, sale, distribution, or possession of any material, compound, mixture, preparation, supplies, equipment, or structure with the intent that it be used for the unlawful manufacture of a controlled dangerous substance.

(2) The transportation or arranging for the transportation of any material, compound, mixture, preparation, supplies, or equipment with the intent that such material, compound, mixture, preparation, supplies, or equipment be used for the unlawful manufacture of a controlled dangerous substance.

(3) The distribution of any material, compound, mixture, preparation, equipment, supplies, or products, which material, compound, mixture, preparation, equipment, supplies, or products have been used in, or produced by, the unlawful manufacture of a controlled dangerous substance.

(4) The disposal of any material, compound, mixture, preparation, equipment, supplies, products, or byproducts, which material, compound, mixture, preparation, equipment, supplies, products, or byproducts have been

used in, or produced by, the unlawful manufacture of a controlled dangerous substance.

B. It shall be unlawful for any person to knowingly or intentionally create or operate a clandestine laboratory for the unlawful manufacture of a controlled dangerous substance.

In our view, the State presented sufficient evidence to prove Defendant's guilt of the charge of creation or operation of a clandestine laboratory beyond a reasonable doubt. At trial, Defendant's probation and parole agent, Cole Gralap, testified that on June 29, 2004, he went to the residence of Nova Young, where Defendant was residing, for the purpose of administering a urine test. Officer Gralap asked Detective Todd Durham of the Grant Parish Sheriff's Department to accompany him for safety reasons. Officer Gralap testified he became suspicious on a prior visit to the home when he saw a padlock on Defendant's bedroom door and a fan blowing air out of the bedroom window.

While Officer Gralap was administering the urine test, he asked Detective Durham to check Defendant's room for weapons and contraband. In Defendant's bedroom, Durham located a coffee grinder, salt, a section of black hose, pipefittings with a brass valve, filters, a cook stove, a spoon, boxes of "labeled off pseudoephedrine boxes," Pyrex bowls, a couple of two liter plastic jugs, and a couple of pint jars, one containing eight lithium batteries soaking in a solution, and the other containing a brown substance thought to be drain cleaner. Additionally, in a metal box, Durham located labels of antihistamines and decongestants as well as a bag of crushed pseudoephedrine.[2] Found in the kitchen were a fire extinguisher that had contained anhydrous ammonia at one time and a bottle of professional drain cleaner. Finally, in Ms. Young's outside storage building, Detective Durham located two

_____

[2]The parties stipulated to the fact that the substance was tested by the crime lab and found to be pseudoephedrine.

empty propane bottles. One was fitted with a plastic nozzle at the top, and the other had only a threaded hole which matched the pipe with the brass fitting found in the bedroom.

Deputy Brad Sudduth, who is certified in the investigation of methamphetamine labs, was contacted and asked to come to the residence. He testified that the "Nazi" method of manufacturing methamphetamine could be carried out with the items found in the residence, with the exception that a sufficient amount of anhydrous ammonia, muriatic acid, and denatured alcohol were needed. At the time the items were located in the residence, Defendant did not have a "working lab." However, the presence of the ground pseudoephedrine pills and the ingredients to make an HCO gas generator (with the exception of muriatic acid) made it appear to Sudduth that the manufacturing process had begun. According to Deputy Sudduth, the pseudoephedrine that was recovered could have made 45.24 grams "under the 60 percentile rate."[3] This would have been worth approximately $4,500.00.

After the items were found in Defendant's room, Detective Durham advised Defendant of his rights, and Defendant initially denied ownership of the items, saying that the items were there when he moved in. However, Deputy Sudduth testified that after he advised Nova Young of her rights, Defendant admitted that the components of the methamphetamine lab were his and Nova was not involved.[4]

Nova Young testified at trial that Defendant stayed with her from April to June of 2004. Ms. Young testified that before Defendant moved into the spare

---

[3]Deputy Sudduth testified that when calculating the conversion rate from the ephedrine to the methamphetamine, they use a baseline of 60 percent, which is very conservative. He testified that in a very controlled setting it is possible to get up to 93 percent, but this is not normally seen on the street.

[4]Additionally, Detective Durham testified that Misty Atwell, Nova's daughter, said that "she had seen Mr. Robertson a couple of days before with a Wal-Mart sack containing the salt and the coffee filters. She had seen him bring it into the residence and go into the room with it."

bedroom, they cleaned everything, including the closet. With the exception of the safe, Ms. Young did not recall any of the items that were found in Defendant's bedroom being there at the time she and Defendant cleaned the room.

To show identity, motive, knowledge, and plan, the State introduced, through the testimony of Deputy Sudduth, evidence concerning a previous investigation of Defendant in April of 2002 for manufacturing methamphetamine. At that time, Defendant was found with "pill soak," the first stage of manufacturing methamphetamine, in his vehicle. In an interview with Deputy Sudduth, Defendant admitted it was his "pill soak," but he explained that he simply carried out the first stage of the process and someone else did the cooking.

Defendant was found in possession of most of the items required to manufacture methamphetamine, and he admitted that the items and equipment were his. His April 2002 statement to Deputy Sudduth reveals his knowledge of the various components needed for manufacturing methamphetamine and of the different stages of the process. Considering the evidence presented at trial, there was sufficient evidence presented to prove beyond a reasonable doubt that Defendant possessed supplies and equipment used in the production of methamphetamine and that he had the intent to use them for the unlawful manufacture of methamphetamine.

Defendant admitted that the items and equipment used in the operation of a methamphetamine laboratory were his. Additionally, the judge gave a limiting instruction to the jury regarding the use of the prior conviction. The error in presenting the evidence of the prior crime was harmless.

**Motion to Suppress**

Defendant contends the trial court erred in denying his Motion to Suppress. Specifically, Defendant contends the officers conducted a warrantless

search of his residence without reasonable suspicion to believe he was involved in criminal conduct and absent exigent circumstances. Defendant contends the presence of a fan in his room in the middle of the summer cannot be held to constitute reasonable suspicion that criminal activity is ongoing. He additionally notes the search was carried out by an officer other than his parole officer. Thus, Defendant contends his statement and the evidence found on June 29, 2004, should have been suppressed.

> When a trial court rules on a defendant's motion to suppress, the appellate court must look at the totality of the evidence presented at the hearing on the motion to suppress. The appellate court should not overturn a trial court's ruling, unless the trial court's conclusions are not supported by the evidence, or there exists an internal inconsistency in the testimony of the witnesses, or there was a palpable or obvious abuse of discretion. *State v. Burkhalter*, 428 So.2d 449 (La.1983), and *State v. Gaspard*, 96-1279 (La.App. 3 Cir. 2/11/98); 709 So.2d 213. The admissibility of evidence seized without a warrant is a question for the trial court. Its conclusions on credibility and the weight of testimony regarding the voluntariness of a consent for admissibility purposes will not be overturned on appeal, unless the conclusions are unsupported by the evidence. *State v. Gachot*, 609 So.2d 269 (La.App. 3 Cir. 1992), *writ denied*, 617 So.2d 1180 (La.1993), *cert. denied*, 510 U.S. 980, 114 S.Ct. 478, 126 L.Ed.2d 429 (1993).

*State v. Bargeman*, 98-617, p. 5 (La.App. 3 Cir. 10/28/98), 721 So.2d 964, 967, *writ denied*, 99-0033 (La. 5/28/99), 743 So.2d 658.

A preliminary examination was held on January 27, 2005. Officer Cole Gralap's testimony presented that day and Deputy Todd Durham's testimony, heard February 10, 2005, were considered in denying the Motion to Suppress.

Officer Cole Gralap testified that he supervised Defendant on both parole and probation at the time the offense occurred. Defendant was on parole for possession with intent to manufacture and distribute methamphetamine. One of the

conditions of Defendant's probation was that he allow Gralap to visit in his home. On April 29, Gralap visited Defendant at his listed address, which was an address Officer Gralap was familiar with. After Defendant did not report to Gralap's office in either April or May, Officer Gralap returned to the residence on June 18. At that time, he visited another of his probationers, Amy Leonard. She was temporarily staying at the residence, and she had tested positive for crystal methamphetamine. Officer Gralap explained the significance of this to him:

> A    It held a lot of significance to me, because in, in the circle that I have of probation and parolees in that area Ms. Leonard is . . . just moved to the address. And I also noticed when I went there that they had a fan coming out of the bedroom, which is, is commonly used to ventilate what would be a, a meth cook. At that time I told Mr. Robertson, hello, but I was most concentrating on Ms. Leonard because she was at that time positive for crystal meth and we were going forward with court proceedings in that matter. But I took note of Mr. Robertson and I wanted to come back to the residence when I was more available to take a look and see what was going on, because at that point I thought Mr. Robertson may be involved in the production of methamphetamine again. That opportunity presented itself to me on June 29th.

Officer Gralap testified that he took no action on the June 18 visit because he was alone with two convicted felons, one of whom tested positive for crystal methamphetamine and the other one known to manufacture methamphetamine and carry a weapon. Officer Gralap testified that he is the only probation officer assigned to Grant Parish, so he tries to work with local law enforcement as much as possible for his safety.

On the night of June 29, Officer Gralap requested the assistance of a Grant Parish deputy for safety reasons. According to Officer Gralap, he initiated the contact with the sheriff's office, and they "had confirmed to me that once I had told

them what was going on they said, well, you know, that's, that's somebody who does that and . . . you know. So, I think they may have had some information, I don't know that for certain." However, Gralap confirmed that he, not the sheriff's department, initiated the visit to Defendant's residence that evening, and he testified that he also wanted to conduct a drug test on Defendant.

Shortly after his arrival at the residence, Officer Gralap had Defendant walk to the restroom to provide a urine sample. As they passed Defendant's bedroom, Officer Gralap noticed a padlock on the door. Defendant told Gralap that the padlock was to keep the children out of his room. This indicated to Officer Gralap that there must be something dangerous in Defendant's bedroom. Officer Gralap testified he went into the room and upon observing several items, he turned the matter over to Deputy Todd Durham for a criminal investigation. Detective Durham was the only officer there at that time. As the case unfolded, they contacted Detective Sudduth to come to the scene.

Officer Gralap testified he observed batteries soaking in a large glass jar; this facilitates separation of the battery for use in the production of crystal methamphetamine. The presence of a safe in Defendant's bedroom also raised Officer Gralap's suspicions. Detective Durham subsequently recovered a number of items of which Defendant initially denied ownership. However, when Nova Young was about to be arrested along with Defendant, Defendant admitted the recovered items were his and had no connection to Nova Young.

Officer Gralap was asked whether he needed a search warrant to conduct a search of Defendant's residence as a parole officer. He explained:

> A    Well, we use a residence check and if we notice
>      something that is possibly criminal we . . . I, I think
>      what we need is a . . . what's determined to be
>      reasonable suspicion is . . . as I've been trained, that

if I have reasonable suspicion then I can actually look in . . . at the residence a little more. What we do in a normal residence check is a cursory check. We'll open up a closet or something to make certain that they don't have any firearms. And we do that with most first visits and then from time to time thereafter to make certain that there's . . . a lot of time what will occur, somebody will get out, they'll go to a residence and they'll have a shotgun in the residence, and we make it clear that that has to not be there.

Officer Gralap's trial testimony may also be considered in reviewing the trial court's denial of a motion to suppress. *See State v. Brumfield*, 96-2667 (La. 10/20/98), 737 So.2d 660, *cert. denied*, 526 U.S. 1025, 119 S.Ct. 1267 (1999). Officer Gralap's testimony at trial varied from his testimony at the suppression hearing in that he testified at trial that he asked Detective Durham to check Defendant's room for contraband or weapons; he did not testify that he first searched the room himself, as he had said at the suppression hearing. He explained at trial that from his vantage point he could see the bedroom being opened and Detective Durham inside. He testified that he did not leave Defendant alone, so he would not have been in Defendant's bedroom at the same time as Durham.

At the suppression hearing, Detective Durham testified that he met Officer Gralap on the road and Gralap told him he was going to Defendant's residence to conduct a urine test and to check the residence for contraband or weapons. Officer Gralap asked for Detective Durham's assistance. Although it was Durham's first time to assist Officer Gralap in a residence check, Durham testified that it was routine for the probation officer to ask the sheriff's office to provide back up. Detective Durham testified that he accompanied Officer Gralap for safety and to assist Gralap with "whatever he needed assistance with." Durham testified he had not planned to go to the Defendant's residence and conduct any type of search prior to

10

Gralap asking for assistance. According to Durham, the residence was known as having housed several subjects involved with narcotics.

Detective Durham testified that upon their arrival at Defendant's residence, Officer Gralap told Defendant why they were there and then accompanied Defendant to the bathroom to obtain the urine sample. While Defendant was giving his urine sample, Detective Durham stood in the living room and watched down the hall, providing security for Officer Gralap. Defendant then returned to the living room, and Officer Gralap was standing in the hall. He asked Detective Durham to look in Defendant's room for any contraband or weapons. Defendant informed Officer Gralap which bedroom was his and that it had a lock on the door. The lock was opened, and Detective Durham entered the room. According to Detective Durham, Officer Gralap "was standing at the bedroom while I was in the room. He was looking through some of the items." Detective Durham testified he observed some lithium batteries soaking in a jar, Pyrex bowls, and plastic bottles in plain view. The items were recognizable to Detective Durham as being items used in the manufacture of methamphetamine. At this point, he was suspicious that Defendant was involved in criminal activity.

Detective Durham advised Officer Gralap of what he had found and then he advised Defendant of his *Miranda* rights. Detective Durham then obtained consent to search the residence and outbuildings from the owner. A subsequent search revealed other items associated with methamphetamine production. Durham asked Defendant about the ownership of the items found in his bedroom, and Defendant initially said the items were there when he moved in. This did not seem reasonable to Durham considering the placement of the items in the room. When Defendant denied ownership of the items, Detective Durham asked the owner if she

11

knew anything about the items. She advised she knew nothing about the items in the bedroom. She informed him that Defendant was the only one with access to the room. When Detective Durham advised both Ms. Young and Defendant that he was going to have to place them under arrest, Defendant admitted all the items found in the residence were his. Durham testified Defendant had been *Mirandized* prior to making this statement.

Detective Durham testified that Defendant's address was familiar to him because he had responded to other calls there and he knew that one person who had lived there prior to Defendant was a convicted drug offender.

The court denied the Motion to Suppress and noted that Officer Gralap initiated the visit to Defendant's residence.

In *State v. Hamilton*, 02-1344, pp. 3-6 (La.App. 1 Cir. 2/14/03), 845 So.2d 383, 387-89, *writ denied*, 03-1095 (La. 4/30/04), 872 So.2d 480, the first circuit summarized jurisprudence covering the lesser expectation of privacy of probationers and parolees, the basis for conducting a warrantless search of such an individual, and the criteria for determining whether a search is reasonable:

> A parolee has a reduced expectation of privacy, subjecting him to reasonable warrantless searches of his person and residence by his parole officer. *See State v. Malone*, 403 So.2d 1234, 1238 (La.1981). The reduced expectation of privacy is a result of the parolee's conviction and agreement to report to a parole officer and to allow that officer to investigate his activities in order to confirm compliance with the provisions of his parole. *State v. Vailes*, 564 So.2d 778, 780-781 (La.App. 2d Cir. 1990). A parole officer's powers, however, are not without some restraints. A parole officer may not use his authority as a subterfuge to help another police agency that desires to conduct a search but lacks the necessary probable cause. The parole officer must believe that the search is necessary in the performance of his duties and reasonable in light of the total circumstances. In determining the reasonableness of a warrantless search of a parolee and his residence, the court must consider: (1) the scope of the particular

intrusion; (2) the manner in which the search was conducted; (3) the justification for initiating the search; and (4) the place it was conducted. *State v. Vailes*, 564 So.2d at 781.

In *State v. Vailes*, the probation officer had received information from a narcotic officer and a confidential informant that the defendant was possibly selling drugs out of, and keeping weapons in, his home. A search of the home revealed a shotgun in plain view in a bedroom and a rifle and other spare weapons parts on a table in a garage. The court concluded that this warrantless search was a reasonable exercise of the probation officer's authority. *State v. Vailes*, 564 So.2d at 781.

It is an appropriate function of a parole officer to conduct unannounced, random checks on parolees. A parolee agrees to submit to such unannounced visits from his parole officer as a condition of parole. *State v. Wesley*, 28,941, p. 8 (La.App.2d Cir. 12/13/96), 685 So.2d 1169, 1174, *writ denied*, 97-0279 (La. 10/10/97), 703 So.2d 603. While the decision to search must be based on something more than a mere hunch, probable cause is not required, and only a reasonable suspicion that criminal activity is occurring is necessary for a probation officer to conduct the warrantless search. *State v. Epperson*, 576 So.2d 96, 99 (La.App. 2d Cir.), *writ denied*, 580 So.2d 920 (La.1991).

In *State v. Shields*, 614 So.2d 1279, 1284 (La.App. 2d Cir.), *writ denied*, 620 So.2d 874 (La.1993), the Second Circuit Court of Appeal found that the search for a probation violation was not a subterfuge for a criminal investigation where there was no ongoing investigation of the defendant at the time an informant reported a possible probation violation. It was also noted that the search of the residence was conducted by probation officers only. Likewise, in *State v. Wesley*, 685 So.2d at 1175, the court concluded that the search of the parolee's residence was not a subterfuge for a police investigation when the parole officers testified that they often conducted routine visits or checks on parolees and that they called the sheriff's office for back-up only when they encountered suspected criminal activity.

. . . .

The jurisprudence allows police officers to accompany parole officers in surprise searches. *See State v. Odom*, 34,054, pp. 6-7 (La.App.2d Cir. 11/1/00), 772

13

So.2d 281, 287; *State v. Shields*, 614 So.2d at 1282-1284, and, most recently, *U.S. v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). In *State v. Shrader*, 593 So.2d 457 (La.App. 2d Cir.), *writ. denied*, 598 So.2d 353 (La.1992), the Second Circuit found that a warrantless search conducted by a parole officer was not a subterfuge for a criminal investigation. The court reasoned that the search conducted was based on reasonable suspicion that the defendant had violated the conditions of his parole. The court stated as follows:

> Although there was police involvement, as Smith explained, it was departmental policy to have assistance when a probation officer intended to search or to effect an arrest. We do not find it unreasonable that the probation officer sought assistance from the sheriff's department given the dangers attendant to such a confrontation. We do not consider this search a 'stalking horse or a subterfuge' for criminal investigation. There is no evidence contradicting the parole officer's testimony that he initiated the visit and searched defendant's premises in order to ensure Shrader's compliance with the terms of his parole.

*State v. Shrader*, 593 So.2d at 460.

In *Hamilton*, the defendant was on parole for a conviction of possession of drugs. Parole officers and a local detective received a tip from an anonymous informant that the defendant was selling cocaine and that there was cocaine in a dresser in his bedroom. The detective contacted one of the parole officers, and the officer told him that he would be performing a residence check at the home and asked for assistance. Later that day, the two parole officers, the detective, and two other officers proceeded to the defendant's house and conducted a search of the home which revealed the presence of cocaine.

In concluding the search was not a subterfuge for a criminal investigation, the court noted that the parole officers planned to carry out the residence check from the tip received from the informant before they had contact with

14

the detectives. There was not an ongoing investigation at the time of the search, and the detectives were present to assist the parole officers. The court also found the facts supported a reasonable suspicion that the defendant may have been violating his parole. The parole officer knew of the defendant's previous drug conviction and the information received from the informant was consistent with the same behavior. Finally, the court found the scope of the search was not unreasonable:

> Applying the factors provided in *State v. Vailes*, the scope of the search conducted by the agents and officers was not unreasonable under the circumstances. When the defendant arrived home, the agents and officers informed him of the reason for the residence check and the defendant allowed them to enter the home. Before discovering the substance suspected to be cocaine, Agent Phelps limited the search to the master bedroom in accordance with the information received in the tip. Agent Roberts and Sergeant Swann remained in the front of the home with the defendant. The defendant was handcuffed as a precautionary measure. Detective Mistretta and Detective Hover assisted Agent Phelps with the search of the bedroom. Detective Hover located the hidden compartment in the dresser of drawers. Agent Phelps opened the compartment and discovered the substance later determined to be cocaine. As previously discussed, the parole officers' justification for initiating the search arose from their reasonable suspicion that the defendant was in violation of his parole. This reasonable suspicion was based on information received in a tip from a female informant who told the officers where drugs could be specifically located in the defendant's home.

*Hamilton*, 845 So.2d at 389.

Under similar facts, the second circuit reached the same conclusion regarding the lack of a subterfuge for criminal investigation in *State v. Epperson*, 576 So.2d 96 (La.App. 2 Cir.), *writ denied*, 580 So.2d 920 (La.1991). In that case, probation officers went to the defendant's residence to execute an arrest warrant. While there, they observed a large amount of cash in plain view that gave them reasonable suspicion that contraband was present. The defendant's probation officer

15

then asked for the assistance of narcotics police officers and a narcotics dog. A search of the residence revealed one marijuana cigarette, but a search of the outside revealed a large amount of contraband. The court concluded the police involvement was initiated by the probation officer and was not a subterfuge.

In this case, the trial court did not abuse its discretion in denying Defendant's Motion to Suppress. The facts support a reasonable suspicion that criminal activity was occurring. Defendant was previously convicted of possession with intent to manufacture and distribute methamphetamine. He was living at an address known to be affiliated, on some level, with persons convicted of drug crimes. Amy Leonard, a probationer who had tested positive for crystal methamphetamine, was temporarily staying at the residence, and Officer Gralap saw a fan being utilized in a manner consistent with ventilating a "meth cook." Finally, the presence of a padlock on Defendant's bedroom door raised Gralap's suspicions that something dangerous was inside. These facts clearly supported reasonable suspicion to believe criminal activity was occurring.

The scope of the search was not unreasonable. Upon arriving at Defendant's residence, Officer Gralap informed Defendant why he and Detective Durham were there, and he had Defendant give a urine sample. The search was initially limited to Defendant's bedroom and several items were discovered in plain view. Defendant remained in the living room while this search was carried out. Once these items were found, consent to search the remainder of the residence and outbuildings was obtained from the owner. Initiating the search was justified given the facts known to Officer Gralap at the time, i.e., the presence of Ms. Leonard who had tested positive for methamphetamine, the presence of a fan being utilized in a manner consistent with methamphetamine production, and the presence of a padlock

16

on Defendant's bedroom door. The search occurred at the address Defendant had provided Officer Gralap and at which he had seen Defendant earlier that same month.

Finally, there is no indication the search was a subterfuge for a criminal investigation. Officer Gralap, acting on his own suspicions regarding possible probation violations, decided to visit Defendant's residence. He initiated the contact with Detective Durham and asked for assistance. There was no evidence indicating there was an ongoing investigation at the time of the search. While it is not clear from the trial court's ruling, it is possible the trial court believed Officer Gralap's testimony at the suppression hearing that he carried out the initial search of Defendant's bedroom that led to the consent search of the remainder of the premises. However, even if the trial court chose to believe Detective Durham's testimony, that it was he, not Gralap, who carried out the initial search, the trial court did not err in its ruling in light of *Hamilton* and *Epperson*.

In addition to challenging the ruling on the motion to suppress, in this assignment of error, Defendant claims the trial court erred in overruling his objection to Officer Gralap's testimony regarding the fan being used for ventilation purposes in the production of methamphetamine. Defendant provides no record page reference to support his argument; however, it appears Defendant is referring to Officer Gralap's trial testimony. The following exchange occurred while Gralap testified about the presence of the fan on his June 18 visit:

> Q     Okay. Now, you mentioned something about a fan blowing out of . . .
>
> A     Uh-huh.
>
> Q     . . . did you notice that particular . . . and you're . . . are you . . . what type of fan are you talking about, if you could describe it?

17

A     It was a black fan that's not even a box fan.  It was a circular type fan, . . .

Q     Okay.

A      . . . if I remember correctly.  And I actually noticed that on the prior visit, on June 18th, and, and that's what started to raise some suspicions about Mr. Robertson in my mind.

Q     A fan blowing outward from the room raised some suspicion in your mind at that point?

A     There's no . . . yes, in that it may be used as some type of ventilation and that it wasn't blowing in, which is what I'm used to.

Q     Okay.  And I'll, I'll, I'll stop you there.  I'm not . . . Officer, have you had any actual trainings in, for example, the production or the cooking of methamphetamine that you . . .

A     Just some basic educational training, that would be . . . you know, not nothing certified, just . . .

Q     Okay.  You're not, you're not lab certified, . . .

A     Oh, no, no.

Q      . . . any of that?

A     No, just, just like an orientation type thing . . .

Q     Okay.

A      . . . so you'll know what it looks like basically.

Q     But, but you've been trained to kind of pick up on certain items to . . .

BY MR. DEVARGAS:  Your Honor, let me object at this time.  He's indicated he has no certification in this area at all and . . .

BY THE COURT:  Let, let Mr. White finish the question prior to . . .

BY MR. WHITE:  Yeah.

**(DIRECT EXAMINATION CONTINUED)**

BY MR. WHITE:

Q      You've, you've been . . .

BY THE COURT: . . . prior to . . .

BY MR. WHITE:

Q      . . . you said you've been trained fair, fairly, basically as far as methamphetamine production; is that correct?

A      Yes.

Q      That training consists of, of trying to just recognize or identify items?  In other words, you're not brought there to, to investigate meth labs or that sort of thing or do Hazmat . . .

A      No.

Q      . . . or any of that sort of thing; is that correct?

A      Correct.

Q      But your basic training consists of identification type . . .

A      Correct

Q      . . . information?

BY MR. DEVARGAS: Your Honor, you . . . let, let, let me object to this particular line of questioning.  He's getting into his expertise in meth . . . in identifying meth, methamphetamine labs.  He doesn't have that expertise, Your Honor.

BY MR. WHITE:  Judge, and, and, and the reason I'm offering this is just to show why this officer did what he did . . .

BY THE COURT:  I understand.  I'm going to . . .

BY MR. WHITE: . . . after that . . .

BY THE COURT: . . . overrule the objection.

BY MR. WHITE: . . . after that.  Okay.  Thank you, . . .

19

BY THE COURT:  I'm, I'm going to overrule . . .

BY MR. WHITE:  . . . Judge.

BY THE COURT:  . . . the objection.

**(DIRECT EXAMINATION CONTINUED)**

BY MR. WHITE:

Q     And you said you noticed that fan in the, in the bedroom on a visit prior to this . . .

A     Yes.

Q     . . . June 29th visit?

A     Yes.

Q     Is that . . . would that have been one of the reasons you brought Officer Durham out there to that location with you on that particular night?

A     It was one of several reasons, yes.

In *State v. Bourque*, 99-1625, p. 8 (La.App. 3 Cir. 6/21/00), 762 So.2d 1139, 1143-44, *writ denied*, 00-2234 (La. 6/1/01), 793 So.2d 181, this court stated:

> A trial court's ruling regarding admissibility of evidence should not be disturbed on review, absent manifest error. *State v. Robertson*, 98-883 (La.App. 3 Cir. 12/9/98); 723 So.2d 500.  It is well settled that a lay witness may not testify to matters outside his or her personal knowledge.  La.Code of Evid. art. 602.  A police officer may testify as to matters within his personal knowledge acquired through experience without first qualifying as an expert. *State v. Gibson*, 97-108 (La.App. 3 Cir. 4/30/97); 693 So.2d 286.

Defense counsel's objection came after Officer Gralap testified that the fan may be used for some type of ventilation.  The trial court did not err in overruling defense counsel's objection.  Officer Gralap was testifying as a lay witness regarding the reason for his increased suspicion as well as his reason for requesting the assistance of Detective Durham.  His testimony regarding the use of the fan was

based on basic training he received regarding methamphetamine production. The trial court did not err in overruling the objection.

### Other Crimes Evidence

Defendant claims the trial court erred in allowing the State to use other crimes evidence at trial. He contests the admission into evidence of a transcript of his guilty plea to possession of methamphetamine after the State closed its case in chief. Specifically, Defendant challenges the admissibility of S-2, a prior Winn Parish conviction, "used in connection with the Amended Bill of Information as well as the introduction of other crimes evidence." He contends that this prior conviction was admitted in violation of *State v. Prieur*, 277 So.2d 126 (La.1973) because the State failed to show the grounds for the relevancy or admissibility of the evidence. This claim lacks merit. The State was not required to give *Prieur* notice.

In *State v. Booker*, 02-1269 (La.App. 1 Cir. 2/14/03), 839 So.2d 455, *writ denied*, 03-1145 (La.10/31/03), 857 So.2d 476, the defendant was charged and convicted of second degree murder on the basis that he was engaged in the perpetration of cruelty to juveniles. On appeal, he claimed the trial court erred in allowing an amendment to the indictment to state that the crime occurred between "12/17/96 and 12/18/2000," the entire life of the victim. The defendant contended that this erroneously allowed the state to circumvent the notice requirements for use of other crimes evidence. The first circuit, finding no merit to the defendant's claim, stated:

> This is not a circumvention of the Code of Evidence. While our Code of Evidence prohibits the use of evidence of other crimes or wrongful acts to prove the character of a person in order to show that he acted in conformity therewith, such evidence is admissible "when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding."

La.Code Evid. art. 404(B)(1). In other words, when the evidence is relevant and probative to establish the elements of the crime charged, it is not rendered inadmissible because it also constitutes evidence of other criminal acts. The notice of use of other crimes evidence required under La.Code Evid. art. 404(B) and *State v. Prieur*, 277 So.2d 126 (La.1973), is not mandated when the evidence is relevant and probative to establish the elements of the crime charged. The limitations of Article 404(B)(1) on the admissibility of "other crimes, wrongs, or acts" evidence apply to exactly that — other crimes, wrongs, or acts — and not to the crime charged. *State v. Duncan*, 2002-0509, p. 11 (La.App. 1st Cir. 9/27/02), 835 So.2d 623.

*Id.* at 464-65.

Since the Winn Parish conviction was included in the bill of information as an element of the offense in this case, it was not necessary for the State to follow the procedures set forth by *Prieur*.

Defendant's claim that the transcript of the Winn Parish plea was erroneously admitted into evidence after the State closed its case in chief is factually incorrect. Prior to the State resting its case, it offered, and the trial court allowed, the introduction in evidence of State's exhibits S-1 through S-7, which included the transcript of Defendant's Winn Parish guilty plea to possession of methamphetamine. This assignment of error has no merit.

III.

**CONCLUSION**

The evidence is sufficient to support a conviction for violation of La.R.S. 40:983, "Creation or operation of a clandestine laboratory for the unlawful manufacture of CDS II, to-wit, Methamphetamine." The trial court's denial of Defendant's Motion to Suppress is affirmed as well as the trial court's decision allowing the State to use "other crimes" evidence at trial.

We remand this case to the trial court for sentencing in accordance with La.R.S. 40:982, the post-conviction sentencing enhancement provision.

**AFFIRMED AND REMANDED**.