CHUTZ, J. |2The ^defendant, Jason M. Lutz, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1, and pled not guilty. After a bench trial, he was found guilty as charged.[1] The trial court denied the defendant’s motion for postverdict judgment of acquittal. The defendant was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The defendant now appeals, raising eight assignments of error challenging the sufficiency of the evidence, the admission of expert testimony, and the constitutionality of the .sentence. For the following reasons, we affirm the conviction and sentence. STATEMENT OF FACTS On January 28, 2014, at 8:19 p.m., the 911 center of the Pointe Coupee Sheriffs Office (PCSO), received a call from a female reporting an unresponsive infant. PCSO Detective Joshua Adams, who was patrolling frozen roads at the time, responded to the scene at Patin Dyke Road, the residence of Jason Lutz (the defendant), Ashley Cogar (the codefendant), Joseph Lutz (the, unresponsive infant and victim herein), and three other young children. Detective Adams noted that the residence was very dirty. He further noted that drug paraphernalia was in plain sight, including many small corner baggies with residue, and little straws on the counters, on the floor in the room with the baby, in the bathroom, and “just everywhere.” Though they were not considered suspects at the time, Detective Adams advised the defendant and Cogar of their rights before asking them to write a statement on what took place that day. In the defendant’s written statement, he Unoted that he and the codefendant walked into the victim’s room at about 8:10 p.m., the code-fendant moved the victim’s blanket, and they noticed that the victim was not breathing. In her written statement, the codefendant stated that she checked on the victim around 4:30 to 5:00 p.m., before she and the codefendant went to the store, at which point the victim appeared to be fine. When they returned around an hour later, she fed her daughters and then went to get the victim to feed him. When she moved the victim’s blanket, he did not move. She picked him up and turned him over and noticed that he was not breathing, and his blanket was stuck to the right side of his face. She removed the blanket and screamed for the defendant who ran for help. Neither the defendant nor code-fendant made any statements to indicate that they tried to feed the victim at any, point between a 6:00 a.m, feeding and the point that he was discovered that evening no longer breathing. POSO Detective Robert Roy was assigned to the case and dispatched to the scene. Detective Roy received consent to search the residence from the codefendant and a consent form was executed. He worked his way to the back bedroom where the victim was located and took photographs of the victim and the surrounding scene, including a soiled diaper on the floor near cut pieces of straws and other drug paraphernalia such as plastic baggies, pills, and a metal pipe with suspected marijuana residue. After the victim and the crime scene were observed, the defendant and codefen-dant were transported to the Sheriff’s Office and separately interviewed. The defendant and codefendant were each advised of their Miranda[2] rights, waiver of rights forms were executed, and each provided a recorded interview. The defendant stated that tp the best of his knowledge, the last time he knew with one hundred percent certainty that the victim was alive was when he saw the 14codefendant feeding the victim that morning. The codefendant claimed that the victim was a “slow eater,” noting that she fed the victim four ounces of milk around 6:00 a.m. on the day in question before laying him down in the middle of his crib at about 7:15 a.m. and going back to sleep. She indicated that the defendant would usually check on the victim if he woke up while she was sleeping, and that they would routinely take turns checking on the victim. The codefendant woke up around 10:30 a.m., and the victim was still asleep at the time. The codefen-dant checked on the victim at about 1:30 p.m., when she went into the bedroom to change clothes. At that point, the victim moved around but remained asleep. The codefendant relaxed for awhile before’ deciding to go to the store with the defendant to get food around 4:30 or 5:00 p.m. She and the defendant asked her roommate, Natasha Garcia (referred to as Tasha), to keep an eye on the children while they went to the store. She further noted that she checked on the victim just before leaving, and he twitched when she made a noise but was “fíne.” The codefendant later reiterated that she saw the victim’s blanket move at that time. ■ , When they returned, the codefendant asked Tasha if the victim woke up while they were gone, to which she responded negatively. The codefendant proceeded to cook dinner for her daughters before checking on the victim that night. The codefendant noted that she had laid the victim down on his stomach, but that he had rolled to the side of the bed, further noting that he would often roll to the side after being laid in the middle of the bed. As the codefendant approached the crib tó check on the victim, the' defendant started walking toward the bathroom, but turned around when the codefendant started screaming. According to the defendant; he began performing CPR and instructed the codefendant to call 911. [^SUFFICIENCY OF THE EVIDENCE In assignments of error numbers one, two, and seven, the defendant challenges the sufficie’ncy of the evidence. In assignment of error number one, he specifically argues that the State did not put forth sufficient proof beyond a reasonable doubt that the defendant and codefendant neglected to feed the victim; In assignment of error number two, he argues that the State did not prove beyond a reasonable doubt that the victim unjustifiably experienced pain and suffering. The defendant argues that there was insufficient evidence that the victim’s malnutrition was caused by the parents’ neglect to feed him and that the trial court reacted emotionally to the photographs of the victim. The defendant further argues that Dr. Oliver The-lin’s testimony on the possibility of adrenal hypoplasia was reasonable and difficult to exclude as a hypothesis of innocence. Finally, in assignment of error number seven and his reply brief, the defendant argues that due process, the principal of lenity, and the specific facts and allegations in this case require a conviction of negligent homicide as opposed • to second degree murder. In. that- regard, the defendant cites; State v. Small, 2011-2796 (La. 10/16/12), 100 So.3d 797, 806, in noting that the felony murder -rule generally- has -been interpreted to require that a direct act of a defendant or his accomplice causé the death of the victim. ' ' In his reply brief, the defendant contends that thé State glossed over the Supreme Court’s holding in Small. The defendant argues that there were no direct acts of killing by the defendant and code-fendant in this case. At oral argument on appeal, the defendant argued that the evidence of a direct act by- him in particular is lacking due to codefendant Cogar’s supposed role as the primary caregiver responsible for feeding the victim. Contending that the victim should have been hospitalized based on his weight at the time, the defendant also claims that thiflfl casé involves the “intervening gross negligence” of Dr. Carl McLemore, Jr., a physician who treated the victim. A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S, Const, amend. XIV; La. Const, art.' I, § 2. The constitutional standard for testing the sufficiency of the evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged and. the defendant’^ identity as the perpetrator of that crime beyond a reasonable doubt. State v. Jones, 596 So.2d 1360, 1369 (La. App. 1st Cir.), writ denied, 698 So.2d 373 (La. 1992). See also La. Code Crim. P. art. 821(B); State v. Ordodi, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. The Jackson standard of review, incorporated in Article 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be' satisfied that the overall evidence excludes every reasonable hypothesis of innocence. See. State v. Patorno, 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Moten, 510 So.2d 55, 61 (La. App. 1st Cir.), writ denied, 514 So.2d 126 (La. 1987). Louisiana Revised Statutes 14:30.1(A)(2) defines second degree murder, in pertinent part, as the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of cruelty to juveniles. This section of La. R.S. 14:30.1 contains the circumstances under which a defendant can be found guilty under the felony murder rule, which dispenses with the necessity of proving | vinens rea accompanying a homicide—the underlying felony supplies the culpable mental state. Small, 100 So.3d at 805. The underlying felony that the defendant was found to have committed,.cruelty to juveniles, is defined in La. R.S. 14:93(A)(1) as the “intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child.” The term “intentional” as used in La. R.S. 14:93 refers to general criminal intent to mistreat or neglect and does not require an intent to cause the child unjustifiable pain and suffering. State v. Duncan, 2002-0509 (La. App. 1st Cir. 9/27/02), 835 So.2d 623, 629, writ denied, 2003-0600 (La. 3/12/04), 869 So.2d 812; State v. Morrison, 582 So.2d 295, 302 (La. App; 1st Cir. 1991). “Mistreatment” as used in this statute is equated with “abuse.” State v. Comeaux, 319 So.2d 897, 899 (La. 1975). The Reporter’s Comment to La. R.S. 14:93 indicates that the laws governing the jurisdiction of the juvenile court should be consulted to determine what constitutes a neglected child. See also State v. Booker, 2002-1269 (La. App. 1st Cir. 2/14/03), 839 So.2d 455, 469, writ denied, 2003-1145 (La. 10/31/03), 857 So.2d 476 (the trial .court properly considered the statutory definitions of “neglect” and “caretaker” provided in La. Ch. Code art. 603 in determining the scope of La. R.S. 14:93). Under La. Ch. Code art. 603(18), “neglect” is the “refusal or unreasonable failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child’s physical, mental, or emotional health and safety is substantially threatened or impaired.” (Emphasis added.) La. Ch. Code art. 603(4) defines “caretaker” as “any person legally obligated to provide or secure adequate care for. a child, including a parent, tutor, Isguardian, legal custodian, foster home parent ... or other person providing a residence for the child.” (Emphasis added.) Pursuant to La. R.S. 14:12, criminal negligence, the requisite mental state for a crime of cruelty to juveniles, is as follows: Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances. Thus, in order for the State to prove the defendant was guilty of the second degree murder where the killing occurred during the perpetration of cruelty to a juvenile, it had to establish either that: (1) the defendant intentionally mistreated or neglected the victim, r&sulting in the infliction of unjustifiable pain or suffering, and, ultimately, death; or (2) that the defendant was criminally negligent in his mistreatment or neglect of the victim, causing the infliction of unjustifiable pain or suffering, and finally, his death. Duncan, 835 So.2d at 629. The same mental state is required for negligent homicide, which is “[t]he killing of a human being by criminal negligence.” La. R.S. 14:32(A)(1). Accordingly, negligent homicide is “the killing of a human being by criminal negligence.” La. R.S. 14:32. Dr. Allyson Boudreaux, an obstetrician and gynecologist qualified to deliver babies and examine prenatal babies, delivered the victim herein, on October 14, 2013, at Woman’s Hospital in Baton Rouge.[3] Dr. Boudreaux noted that her records show that the codefendant was twenty-four weeks pregnant at her first visit for the pregnancy with the victim. Confirming that she delivers about 200 babies a year, Dr. Boudreaux noted that most women come in for prenatal care at seven to eight weeks pregnant, with twelve weeks being the extreme. Dr. Boudreaux recalled that the codefendant was an atypical patient, noting that she missed several |flappointments, which resulted in significant gaps in between her handful of visits. The codefendant was further diagnosed with Group B Streptococcus (Strep), a bacteria that normally lives on the skin that • can cause meningitis, pneumonia, and sepsis in newborn babies. When the codefendant visited Dr. Bou-dreaux on October 11, 2013, at thirty-nine weeks pregnant, she was dilated and her blood pressure was elevated. Further, according to the doctor’s notes, the codefen-dant had not been taking her medication as prescribed, but indicated that she had altered her diet as instructed. Dr. Bou-dreaux sent the codefendant for delivery and induction of labor on that date due to noncompliance (with the medication prescription and scheduled office visits) and elevation in blood pressure. The victim was delivered three days later at seven pounds and eight ounces, a normal weight. Due to her status as a carrier or suspected carrier of Group B Strep, the codefendant was treated with antibiotics during labor, and the victim was required to stay hospitalized for forty-eight hours before discharge. Dr. Boudreaux testified that in accordance with protocol, a head-to-toe examination of the victim would have been performed at delivery, including a suck and swallow examination, and various tests for genetic issues and blood type. Dr. Bou-dreaux noted that abnormalities would have been reported to the pediatrician and that she was not aware of any abnormality. Dr. Boudreaux confirmed that the antibiotics taken by the codefendaht would not affect the results of newborn metabolic screening. She further noted that pediatricians and the hospital'nursing staff ensure that the baby.is eating well and making wet and dirty diapers as a part of their ongoing assessment of a newborn baby hi the hospital. A baby would not be sent home if there was any concern about the baby being able to feed appropriately. In this case, the doctor was unaware of any problems in the discharge of the victim. | inDr. Boudreaux viewed a photograph of the victim at birth and- confirmed that he appeared to be a normal newborn baby in the photograph. Per her treatment,. the doctor did not identify any medical problems that would have prevented the victim from desiring to eat. After the doctor was further shown photographs of the victim at the time of his death, she confirmed that the photographs were indicative of a baby under severe malnutrition and constituted clear evidence of neglect.[4] Dr. Boudreaux confirmed that the pictures alone did not provide the cause of the malnutrition with any medical certainty. She did, however, state that malnutrition is caused by someone not feeding the child, although she conceded that not feeding a child is not the only cause, of malnutrition. Dr. Boudreaux reiterated that the victim was,a normal, healthy child at birth. She confirmed that Group B Strep would “absolutely not” affect the victim’s desire to eat, reiterating that in this case the mother was treated appropriately so .there would be no issue relatéd to the condition. During his recorded and transcribed pretrial interview, the defendant admitted that he had a drug problem. When asked who cared for the victim, he stated, “Me and my wife, that’s who.” He later stated that the codefendant usually checked on the victim but that whenever he was home, he would “always” check on him. The defendant was also questioned about the victim being malnourished. When specifically asked whether the victim was regularly fed during the day, or simply fed once and left in the crib, the defendant responded, “He would never be just fed and left in his crib, no. We would feed him, we would always check on him.” When asked if the victim was alive when they left to go to the store, the defendant stated that he looked at the victim though he did not touch the blanket or the victim and contended that maybe the heater motor was blowing the blanket, |uwhich he indicated could have made it appear as though the victim was breathing. Regarding the extent of his drug problem, the defendant stated, “I take maybe one or two roxys a day depending' on what I can afford, or Lortabs. That’s my drug of choice. And smoking weed. That’s it.” The defendant conceded that he had concerns about the victim’s diet, noting that they began increasing his intake. He also stated that the codefendant normally took care of the victim, as he was only there half of the day or less. The defendant repeatedly conceded that he failed to adequately care for the victim, at one point stating, “Main thing is we should have checked on him more, but I know every time I went in the house or I was at the house, I always checked on him.” He later added, “I already know I f—-d up. He’s dead, ain’t he? I should have checked, been a hell of a lot more thorough.” The defendant stated that the victim had trouble breathing but was not diagnosed in that regard, contending that they informed the doctor of his condition.. During her recorded and transcribed interview, the codefendant admitted that there was no heat in the children’s bedrooms, though other parts of the house had heat, and that one of the girls did not have a blanket, explaining, “[s]ome idiot screwed up my heater.” When asked about the health and condition of the victim, the codefendant stated, “He can’t gain weight. He can’t. For some reason. I don’t know why.” She added, “I feed him all the time.” She confirmed that the victim had not gained any significant amount of weight since birth. When asked why she had hot fed the victim all day on the day he died, she stated, “It was my mistake for not getting him up because I knew I should have gotten him up to feed him. That’s on me. I know that. I know.” When asked how many ounces she was supposed to feed the victim daily, she repeatedly stated, “Four ounces.” She later indicated that she misunderstood the question,- and four ounces was the amount that she would place in one bottle and not the total amount she feed the victim daily. The [ l2codefendant was also questioned about the dirty diapers laying all over, the baby’s crib, and stated, “That was my fault. I was going to pick those up. That’s on me. That’s on me.” When asked about the drugs in the house, the codefendant indicated that the defendant had a drug problem and was taking Suboxone to help him get rid of the problem. She denied that she routinely slept all day and indicated that she took care of her children. When asked about the condition of the victim’s skin, specifically about his skin receding off of his bones and muscles, the codefendant claimed that the victim’s skin was in that condition from birth, adding that she could not believe how skinny he was at birth, noting that he would eat a significant amount but would not gain weight. The codefendant admitted that she was overwhelmed with the children, noting that they would constantly scream at her, and conceded she sometimes had too much going on with the other children and did not have time to check on the victim. When asked if she thought that might have caused the victim to die, she stated, “Probably[.]” When asked what she would change or do differently if she could, she replied, “I would have fed him more.” She added that she did feed the victim more often at one point, but when he kept spitting it up, she decreased the amount she fed him, and he “seemed to be doing fine.”[5] Dr. McLemore, a family physician who has been treating babies daily since 1978 at his practice in New Roads, was accepted' by the trial court as an expert in family medicine. Dr. McLemore noted that he first saw the victim on November 21, 2013, with the indicated reason for the visit being the codefendant’s concern 11sregarding the victim’s stuffy nose and difficulty breathing. A respirator rate exam performed that day indicated' that the victim was breathing at a normal rate. A very slight weight increase since the victim’s date of birth was noted, specifically from a weight of 7 pounds and 7.9 ounces at birth, to a weight of 7 pounds, and 8.3 ounces at the time of the, appointment, over one month after the victim’s birth. In .the history provided by the .codefendant, she indicated that she did not smoke during pregnancy or use tobacco. The codefen-dant further indicated that she was feeding the victim three ounces of formula every three to four hours, no . difficulty feeding was reported, and the codefendant indicated that the victim was having a bowel movement four to five times a day.. The examination notes indicate that the victim was a healthy five-week-old male infant. The doctor noted his impression that the victim had not gained any weight and instructed the codefendant to feed him every three hours and to bring him back in two weeks for a recheck of the weight. The codefendant returned the victim about two weeks .later on December 2, 2013 (noted as returned due to concerns with weight gain), at seven weeks old, at which point his weight was 7 pounds and 7.2 ounces, nearly the same as the last visit. The visit notes further state that the codefendant had gone to WIC as previously suggested by the,,doctor, and that the victim was being ■ fed. every- four hours, taking three ounces. The victim was alert and had a normal suck from a bottle. The doctor observed that the victim had not gained any weight and instructed the code-fendant that the child needed to be fed every three hours 24/7 and to bring the victim back in one week. The codefendant did not return the victim in a week as instructed, or at any point after the December 2, 2013 visit, which Dr. McLemore perceived as neglect assuming that the victim was not seen elsewhere. Another missed appointment occurred on December 23, 2013. In addition to the appointments missed in December, it was noted that appointments were previously missed on November 13 |14and 18, 2013. The doctor did not note or observe any condition that would have affected the victim’s desire to eat or ability to process food. Further, the codefendant did not indicate that the victim lacked the desire to eat. Ty Chaney, a paramedic for Acadian Ambulance Service and the certified, lead chief investigator of sudden unexpected infant deaths for the Pointe Coupee Coroner’s Office, conducted the investigation in this case. During Ms interview of the code-fendant, she indicated that at around 6:00 a.m. that morning she fed the victim. She laid him down on his stomach in his crib at around 7:15 a.m., which was further noted as the last time that the codefendant knew the victim was alive. She did not check on him until after 8:00 p.m., when he was found dead, lying on his back with slight foam from the mouth. The codefendant responded negatively as to whether any member of the household attempted CPR. She further responded negatively as to whether the victim' had abnormal growth or weight gain, apnea (breathing issues), or any birth defect. Natasha Garcia was living with the defendant and codefendant from the time of the victim’s birth, until the time of his death. Garcia had a drug problem during that time period. She further confirmed that the defendant had a drug problem as well, but denied that the codefendant had a problem with drug use. She and the defendant and a boyfriend, who was also living there, would look for work' to make money to buy drugs and routinely “get high” on “[p]ills, weed,” and sometimes “coke.” The pills consisted of Lortabs, Oxycodone, and Oxycontin. Garcia testified that the defendant was often away from home and that the codefendant was overwhelmed with the children. She noticed'that the victim began looMng different around a month after birth, such that it caused some concern. She recalled the codefendant stating that the doctor instructed her to feed the victim on demand, every three hours and whenever he was hungry. She noted that the codefendant repeatedly rescheduled the victim’s subsequent appointments. She stated that thej1fi victim was noticeably sick and when she questioned the codefendant about the missed appointments, she would give reasons such as a lack of gas for her vehicle or the defendant being at work. When asked how she knew something was wrong with the victim, Garcia stated, “Because of how he looked. He wasn’t gaining weight. He was sleeping a lot. He wasn’t eating, you know, obviously.” Garcia noted that the defendant and co-defendant had irregular sleeping habits and would sometimes stay up until 4:00 or 5:00 a.m. and stay in bed until the afternoon. She further noted that the girls would sometimes knock on her door to ask for food or something to drink. Garcia also had to bathe the children at times. When asked how often the defendants fed the victim, she stated that she could only count a handful of times that she saw feedings, but noted that she was often not there and that when she was there, the victim was often in the back room presumably sleeping. She confirmed that the codefendant had expressed concerns about the victim’s breathing. Garcia recalled being asked to watch the victim and his siblings when the defendant and the codefendant went to the store before discovering the victim unresponsive. The defendant told her that he had just laid the victim down and had checked on him. Garcia remained in her room while they were gone for about an hour, and did not go in the room to check on the victim, though she had an audio baby monitor that would allow her to hear him if he woke up. She stated that around 8:00 p.m., the defendant abruptly entered her room, “freaking out,” and told her that the victim was not breathing and to call 911. Dr. Cameron Snider, an associate medical examiner for the First Judicial District of Florida and an expert in pathology, performed the autopsy of the victim’s body on January 31, 2014, while he was the chief forensic pathologist in Baton Rouge. In reviewing the photographs, Dr. Snider noted that the victim was very, small for his age, very malnourished, and dehydrated. His lips werej 1fi discolored and dry from dehydration and the lack of supporting tissue or fat, his body tissues over his bones were sunken down, his cheeks and eyes were sunken inward, the markings of his ribs were visible, and he had crease marks - and wrinkles on his neck also caused by dehydration, and some increase of the thickness of the skin called “scale crust,” which could be caused by a lack of daily cleaning. Dr. Snider’s autopsy report further noted oral mucosa and/or tongue dryness, additional manifestations of dehydration or lack of proper food. The victim did not. have a bulging prominent type of head, and the supporting tissues under his skin were decreased into attenuation, which means there was thinning of the tissues, from head to toe. The victim did not have any bruises, cuts, or scrapes or any other indication of .inflicted or accidental injuries. The victim’s organs were also small in size and decreased in weight from poor nutrition. The victim’s trachea and intra-pulmonary bronchi were unobstructed, and-his stomach contained two millimeters of fluid consistent with baby formula. Based on the material in his intestinal tract, the doctor concluded that the victim had been fed earlier in the day, but not closer to the time of his death. The lack of yellow fat on external surfaces indicated that the fat was being utilized by the victim to preserve life due to a lack of proper nutrition or energy coming into the body. Based on all of his testing, Dr. Snider concluded that the victim’s cause of death was marasmus[6] and dehydration, due to “undernutrition.” In his opinion, presupposing that proper nutrition was neglected to be given to the victim, the manner of death was homicide. Dr. Snider further stated, “this is not a natural death because the infant had a problem with [his] own enzymes and stuff.” When|17 asked if the victim suffered, Dr. Snider responded, “yes,” providing the following reasons: When a child is hungry or thirsty, it has the sensation it wants to eat. We all know what hunger and thirst is, the stomach rumbles and we can eat. This child was just , not only hungry or. thirsty, this went beyond that for this,' child. The child was starting to use its own body tissue, its fat, and its skeletal muscle to try to keep the blood vessels filled with the nutrients to keep the blood warm. So the child was metabolizing its own body tissues, so everything was becoming, smaller in the child. The child just wasn’t .hungry, it was losing weight. Dr. Snider requested that Dr. Zheng-gang Xiong perform the autopsy of the victim’s brain to determine if there were any abnormalities. Dr. Xiong, an expert in neuropathology, conducted brain autopsies on an almost daily basis. As a result of his autopsy of the victim’s brain, Dr. Xiong found two abnormalities, diffuse cerebral edema (abnormal accumulation of water in the brain) and hippocampal malformation (a rare congenital condition associated with epilepsy and that causes seizures). Causes of edema include malnutrition or lack of oxygen. Based on the information received from Dr. Snider, Dr. Xiong concluded that the edema in this case was caused by malnutrition. While subsequently conceding that it was outside of his area of expertise, Dr. Xiong responded negatively when asked if his practice or research showed that hippocampal malformation could cause the lack of a desire to eat, Dr. Thelin, who is board certified in pediatrics and neonatology, reviewed the autopsy report in this case. In addition to the autopsy report, he received the complete inventory of the autopsy, the autopsy photographs, the brain autopsy from Dr. Xiong, the chart for Dr. McLemore, and the records from Woman’s Hospital.' In reviewing the autopsy, Dr. Thelin searched for an explanation as to why the victim was not growing. Considering the autopsy and the weight of the adrenal, he suspected adrenal hypoplasia. Dr. Thelin further testified, “And if the baby is not able to make cortisol and aldosterone, he could be lacking some hormone and he hHcould be weak and he could have difficulty feeding.” He testified that if the victim had that disease, it could be a good explanation for why he was not growing and'failing to thrive. When asked about his conclusion regarding the disease, he stated, “I suspect but I have no proof that he could have had adrenal hypoplasia,” adding that this possibility was never investigated. He noted that he would have hospitalized the victim based on his failure to- thrive and contended that the simple instruction to feed the child every three hours was below the sufficient standard of care, though he agreed that the baby in general needed to be fed at that rate. Dr. Thelin confirmed through his testimony that, his comments were based on his suspicion as opposed to a diagnosis. When recalled to testify on rebuttal in response to Dr. Thelin’s testimony, Dr. Snider noted that as a pathologist, he spent five years training to diagnose different diseases. He stated that the intersti-tium, the supporting tissue of the adrenal gland, was small because the child was not being fed. He further stated that the adrenal glandular tissue was fine, which -was inconsistent with adrenal cortical hypopla-sia. He stated that he was one hundred percent certain that the victim did not have hypoplasia, also known as Addison’s disease, and that the victim died from a lack of nutrition. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson, 459 So.2d 31, 38 (La. App. 1st Cir. 1984). The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the txier of fact insufficient. State v. Quinn, 479 So.2d 592, 596 (La. App. 1st Cir. 1985). Unless there is-internal contradiction or irreconcilable conflict with the physical evidence, the testimony of a single witness, if believed by the fact finder,-is sufficient to support a factual conclusion. State v. Marshall, 2004-3139 (La. 11/29/06), 943 So.2d 362, 369, cert. denied, 552 U.S. 905, 128 S.Ct. 239, 169 L.Ed.2d 179 (2007). LaWhere there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is. one of the weight of the evidence, not its sufficiency. Richardson, 459 So.2d at 38. The trier of fact’s determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder’s determination- of guilt. State v. Taylor, 97-2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932. Generally, the Louisiana Supreme Court has interpreted the felony murder rule to requite that a direct act of a defendant or his accomplice cause the death of the victim and has refused to hold persons criminally culpable for setting in motion chains of events that ultimately result in the deaths of others. See Small, 100 So.3d at 806; State v. Myers, 99-1849 (La. 4/11/00), 760 So.2d 310, 315-16; State v. Kalathakis, 563 So.2d 228, 231-33 (La. 1990); and State v. Garner, 238 La. 563, 115 So.2d 855 (1959). Thus, in Garner, the Louisiana Supreme Court adopted the “agency test,” which restricts criminal culpability to deaths directly caused by the defendant and co-felons, and rejected a “proximate cause” test by which a defendant may be held liable for any death proximately caused or resulting from the events set into motion by the defendant’s actions. Small, 100 So.3d at 809; Myers, 760 So.2d at 315-16. In the context of felony murder, this issue arises most often when death results from the. responses of third parties fleeing, resisting, or pursuing a defendant. See Small, 100 So.3d at 806-07. In Garner, the State charged Robert Garner with manslaughter in the death of George Carson. Garner, 115 So.2d at 856. Carson, an innocent bystander, was accidentally shot by a bartender who was defending -himself against Garner, who had attacked the bartender with a knife. In quashing the prosecution, the trial judge emphasized that the defendant was not the actual and immediate killer of the deceased, who was killed by a shot from a pistol fired by the bartender, who wasj afl shooting at the defendant in self-defense. Garner, 115 So.2d at 857. On appeal, the State argued that Garner was guilty of felony manslaughter because he was attempting to murder the bartender when he “set into motion a train or series of events” that resulted in Carson’s death and “there was no third intervening, independent force which manifested itself so as to divest the defendant of his criminal responsibility.” Garner, 115 So.2d at 858. The Louisiana Supreme Court, however, after reviewing the jurisprudence of other jurisdictions, rejected the State’s theory and instead strictly construed the pertinent criminal statutes and applied the rule of lenity to find that Garner could not be. held criminally liable for Carson’s death. The Court held that by employing the term “offender” in- the felony manslaughter statute, the legislature prescribed that the physical element may only be shown by proof that the defendant or an accomplice performed the direct act of killing. See Garner, 115 So.2d at 864. In Small, the Louisiana Supreme Court reversed the defendant’s conviction for second degree felony murder based on the underlying felony of cruelty to juveniles. Small, 100 So.3d at 799. The defendant, a mother of two children aged six and seven years, old, left her sleeping children alone and unsupervised at their apartment in the late evening while she went out to drink alcohol at a friend’s home. While the defendant was away, a fire started in the apartment. One of the children was unable to escape the apartment and had stopped breathing by the time she was discovered by firemen.. She later died as a result of smoke inhalation. Small, 100 So.3d at 800-01, The State argued the defendant was guilty of second degree felony murder having 'committed the underlying felony of cruelty to juveniles. At trial, the State presented evidence that the defendant had previously pled guilty to criminal abandonment, in relation to her lack of supervision of her children, as proof of a history of criminally negligent behavior and cruelty to juveniles. Small, 100 So.3d at 802. At the conclusion of trial, the jury convicted 1aithe defendant of second degree murder on the predicate offense .of cruelty to juveniles. The Second Circuit Court of Appeal affirmed the defendant’s conviction. Small, 100 So.3d at 803. The Louisiana Supreme Court granted the defendant’s writ application to determine whether the criminally negligent act of lack of supervision, and not a direct act causing the child’s death, could support a second degree murder conviction. Small, 100 So.3d at 805. In reversing the defendant’s conviction, the Louisiana Supreme Court explained that second degree felony murder is a crime of violence, which is defined in La. R.S. 14:2(B) as “an offense that has, as an element, the use, attempted use, or threatened use of physical force against the person or property of another, and that, by its very nature, involves a substantial risk that physical force against the person or property of another may be used .... ” Small, 100 So.3d at 809. While acknowledging that cruelty to juveniles can take many forms that include physical forcé and direct acts of abuse, the Court reasoned, “neglect in the form of lack of supervision simply cannot supply the direct act of killing needed for a second degree felony murder conviction.” Small, 100 So.3d at 810. As the Court further explained, “An interpretation of the felony murder statute to allow a second degree murder conviction anytime a parent is criminally negligent in failing to supervise her child and the child dies as a result of some intervening act would be contrary to the rule of lenity and could result in unintended consequences.” Small,' 100 So.3d at 811 (emphasis added). The Court ultimately reversed the conviction and sentence for second degree murder but remanded the case for resentenc-ing on a conviction of negligent homicide. In reviewing some of its prior jurisprudence, the Supreme Court in Small, 100 So.3d. at 812, made clear that, regarding causation, it is not essential that the act of the defendant should have been the sole cause of the death; it is sufficient that the act hastened the termination of life or contributed, mediately or | ^immediately, to the death, in a degree sufficient to be a clearly contributing cause. The Supreme Court further noted that in previous decisions, it had found the State could establish causation by showing the defendant’s conduct was a “substantial factor” in bringing about the forbidden result, or that the defendant’s acts were a clearly “contributing cause” of death. Small, 100 So.3d at 812. See also State v. Irving, 2013-0535, p. 4, 2013 WL 5915218 (La. App. 1st Cir. 11/1/13) (unpublished), writ denied, 2013-2821 (La. 5/16/14), 139 So.3d 1024. In his reply brief, the defendant notes that this causation analysis was part of the negligent homicide discussion in Small. However, in Small, the Supreme Court was generally addressing the type of causal connection the State must show between a defendant’s conduct and the victim’s death for a defendant to be criminally culpable “where multiple causes led to the death.” Small, 100 So.3d at 812. In doing so, the Court cited State v. Matthews, 450 So.2d 644, 646-47 (La. 1984), which upheld a second degree murder conviction. In Matthews, the Court found that while the immediate cause of death was drowning; the defendant’s acts of beating and leaving the victim was “a clearly contributing cause even if the victim rolled, crawled or stumbled into the water.” Matthews, 450 So.2d at 647. Rather than having refined any law in Small, the Supreme Court merely reaffirmed that the felony murder rule has been consistently interpreted the same way for over fifty years in this State; that is, from the 1959 decision of Garner. Irving, 2013-0535 at p. 4. Subsequent to Garner, in State v. Kahey, 436 So.2d 475 (La. 1983), the Supreme Court upheld a second degree murder conviction in connection with the death of one of the minor children living in the household of the defendants, Vivian and Sheral Kahey, who were husband and wife. The defendants lived together with two other adult women and thirteen minor children in Sabine Parish. When the victim, twelve-year-old Arthur Armstead, was found unconscious on the floor, his mother and defendant, Vivian Kahey, tried | ^unsuccessfully to revive him. Arthur was pronounced dead on arrival at a hospital. The autopsy revealed that Arthur had suffered torture and extreme hunger,- his scarred body weighing less than forty-five pounds. His hands and feet bore marks indicating that he had been bound. The child had experienced a severe loss of muscle tone, dehydration, stress ulcers, severe shock, low-blood pressure, faulty clotting mechanisms in his blood, and damaged capillaries, and these conditions ultimately led to his death due to heart failure. Witnesses testified that the defendants, and at times the child’s mother, subjected Arthur to physical abuse as a result of their religious beliefs. As punishment for his alleged moral shortcomings, Arthur was regularly deprived of food, severely whipped with an extension cord, and bound at his hands and feet. Kahey, 436 So.2d at 480. The physician who conducted the autopsy in Kahey, Dr. McCormick, testified that the cardiac tamponade that caused the child’s heart failure and death was the result of a severe protein deficiency. He further testified the child’s malnutrition was evinced by his lack of weight, his protuberant abdomen, and the absence of rigor mortis over twelve hours after his death. Other witnesses corroborated the doctor’s evidence by testifying to the starvation, beatings, and binding of the child by the defendants. In finding there was abundant evidence from which a rational trier of fact could conclude beyond a rea-sonáble doubt that the defendants’ actions caused Arthur’s death, the Court stated, in part, that the evidence therein “suggests no cause of death which' cannot be attributed to the defendants.” Kahey, 436 So.2d at 494. ■ In State v. Woods/State v. Scott, 44,491, 44,492 (La. App. 2d Cir. 8/19/09), 16 So.3d 1279, writ denied, 2009-2084 (La. 4/9/10), 31 So.3d 380, which was cited by the Supreme Court with approval in Small, Tiffany Monique Woods and Emmanuel Scott were convicted of second degree murder following the death of their five-month-old child. Small, 100 So.3d at 810. In Small, the Supreme Court] ¾ noted that the parents in Woods committed second degree murder by switching from infant formula to diluted milk, which resulted in the five-month-old baby’s death from malnutrition, and where witnesses testified the child was visibly emaciated and his death was not sudden. Small, 100 So.3d at 810. Evidence presented at trial established that at his death, the child had only gained seven ounces over the. three-and-one-half months following his release from Tulane Medical Center, but had gained approximately one ounce per day while there. Further, it would have taken “an extended time” for the child’s condition to deteriorate. Woods, 16 So.3d at 1283. Additionally, Scott testified that the victim’s family had enough income to purchase food but fed the child watered down organic cows’ milk in an attempt to keep the child from spitting up so frequently. Woods, 16 So.3d at 1285. The court in Woods affirmed the convictions, noting that: the child failed to gain a significant amount of weight in the three-and-one-half months following his release from the hospital and his death; the defendants failed to timely seek medical treatment for the child who was apparently in dire straits at the time of his death;, the child would have had an obvious bad reaction to his changed diet; the defendants indicated they did not observe any of these changes; and the defendants were criminally negligent in failing to so notice. Woods, 16 So.3d at 1288. We are not persuaded by the defendant’s argument that he was not guilty of second degree murder because he was not the victim’s primary caregiver. In Booker, this court upheld, a second degree murder conviction based on cruelty to a juvenile wherein hypothermia, battered child syndrome, and malnourishment were the causes of death of the four-year-old victim. The.victim and her mother lived with the defendant (the grandfather of the victim) in a dilapidated caretaker’s cottage, Booker, 839 So.2d at 458. On appeal, the defendant, in pertinent part, argued that because he was not the parent or legal guardian of the victim, he wasj^not legally responsible for the child, and thus, was not criminally liable for neglect of the child. Booker, 839 So.2d at 468. In rejecting this argument, this court noted that as a person providing residence to the victim at the time of her death and for most of her short life, the defendant clearly met the definition of a caretaker. This court held, “[a]s a caretaker- of the minor child, the defendant was, along with the child’s mother, legally obligated to supply the child with food, clothing, shelter and care.” Booker, 839 So.2d at 469. In this case, not only was the defendant a residential parent of the victim, but based on statements by the defendant and the codefendant, the tasks of feeding and checking on the victim were shared among the defendants, on the basis of who was awake and/or present at home. As the victim’s residential parents, both of the defendants were caregivers responsible for the victim. In this case, the evidence supports the finding of the trier of fact that the victim died as a direct'result of cruelty to a juvenile and that two people committed that offense, the defendant and codefen-dant. Unliké the facts presented in Small or Garner, in this case there was no intervening factor or third party act that caused the victim’s death. Even accepting the defendant’s argument that Dr. McLe-more was grossly negligent in not hospitalizing the victim, the trial court could have reasonably concluded that the negligent mistreatment and neglect by the defendants, including the severe undernourishment of the victim and the failure to provide him with medical care even though he was obviously severely emaciated, was a substantial. factor or clearly contributing cause of the victim’s death. Considering the testimony regarding the victim’s condition and lack of proper nutrition and the defendants’ statements indicating their failure to regularly feed or check on the victim, the record supports the trial court’s finding of a legal causation between the underlying felony, cruelty to juveniles, and the child’s death in this case. Moreover, the evidence reveals that just before his death, the victim’s |afilife was being sustained by the use of his own fatty tissues. Thüs, the record supports a finding that the criminally negligent 'mistreatment or neglect' by the defendant resulted in unjustifiable pain or suffering caused to the victim. In reviewing the evidence, we cannot, say that the trial court’s determination was irrational under the facts and circumstances presented to it. See Ordodi, 946 So.2d at 662. An appellate court errs by substituting its appreciation, of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis- of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the trier of fact. State v. Calloway, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). A court of appeal impinges on a fact finder’s discretion beyond the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. See State v. Mire, 2014-2295 (La. 1/27/16), — So.3d -, - (per curiam). After a thorough review of the record, we are convinced that a rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder. Accordingly, we find no merit in assignments of error numbers one, two and seven. EXPERT TESTIMONY In assignment of error number three, the defendant argues that the trial court erred in allowing Dr. Boudreaux to testify about her conclusions of neglect after viewing the-photographs of the deceased victim. The defendant notes that Dr. Bou-dreaux admitted that her expertise was with pregnant women and fetuses in the womb, but did not extend to newborn babies. The defendant contends that the trial court relied on Dr. Boudreaux’s testimony in finding neglect. In assignment of error number four, the defendant argues that the trial court erred in allowing Dr. 127Xiong to testify beyond his expertise on whether the victim had a brain malformation that could affect his desire to eat. The defendant argues that the trial court im-permissibly relied on Dr. Xiong’s testimony in reaching a verdict. In assignment of error number five, the defendant argues that the trial court erred in permitting Dr. Snider to testify beyond his expertise on the alleged neglect of the victim and his alleged pain and suffering. In assignment of error number six, the defendant argues that the trial court erred when it gave Dr. Snider’s testimony, undue weight, over the expertise and specialty of Dr. Thelin. The defendant argues that Dr. Thelin had a more specialized knowledge than Dr. Snider on the effect of an' abnormal brain malformation on a newborn’s appetite and whether a malnourished newborn experienced pain. Relevant evidence is evidence which tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. Code Evid. art. 401. All relevant evidence is admissible except as otherwise provided by positive law. Evidence which is not relevant is not admissible. See La. Code Evid. - art. 402. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or waste of time. La. Code Evid. art. 403. A witness who .is qualified as an expert by knowledge, skill, experience, training, or education may .testify in the form of an opinion or otherwise if: (1) the expert’s scientific, technical, or other specialized knowledge will help -the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case. La. Code Evid. art. 702. The Supreme Court has | ^placed limitations on this codal provision in that* “expert testimony, while not limited to matters of science, art or skill, cannot invade the field of common knowledge, experience and education of men.” State v. Stucke, 419 So.2d 939, 945 (La. 1982). Generally, the test of competency of an expert as the expert’s knowledge of the subject about which he is called upon to express • an opinion. State v. Ferguson, 2009-1422 (La. App. 4th Cir. 12/15/10), 54 So.3d 152, 166, writ denied, 2011-0135 (La. 6/3/11), 63 So.3d 1008. Courts can also consider whether a witness has previously been qualified as an expert. State v. Craig, 95-2499 (La. 5/20/97), 699 So.2d 865, 870, cert. denied, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997). A combination of specialized training, work experience, and practical application of the expert’s knowledge can combine to demonstrate that the person is an expert;' a person may qualify as an expert based upon experience alone. State v. Jarrell, 2007-1720 (La. App. 1st Cir. 9/12/08), 994 So.2d 620, 633. Trial courts are vested with great discretion in determining the competence of expert witnesses, and rulings on the qualifications of an expert witness will not be disturbed unless there was an abuse of that discretion. Jarrell, 994 So.2d at 633; 1988 Comment (d) to La. Code Evid. art. 702 (“Broad discretion should be. accorded the trial judge in his determination as to whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert.”) Moreover, once an expert has been found qualified, the trier of fact is entitled to assess credibility and accept or reject the opinion of the expert in light of the expert’s qualifications and the facts that form the basis of his or her opinion. State v. Lofton, 2008-0747, p. 2 (La. App. 1st Cir. 9/12/08), 2008 WL 4190572 (unpublished), writ denied, 2008-2661 (La. 5/22/09), 9 So.3d 140. In State v. Foret, 628 So.2d 1116, 1123 (La. 1993), the Louisiana Supreme Court adopted the test set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-93, 113 S.Ct. 2786, 2796-97, 125 L.Ed.2d 469 (1993), ^regarding proper standards for the admissibility of expert testimony which requires the trial court to act in a gatekeep-ing function to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. State v. Chauvin, 2002-1188 (La. 5/20/03), 846 So.2d 697, 700-01. To assist the trial courts in their preliminai-y assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue, the Louisiana Supreme Court suggested the following general observations set forth in Daubert are appropriate: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the methodology is generally accepted by the relevant scientific community. See Chauvin, 846 So.2d at 701. Thus, Louisiana has adopted Daubert’s requirement that in order for technical or scientific expert testimony to be admissible under La. Code Evid. art. 702, the scientific evidence must rise to a threshold level of reliability. Chauvin, 846 So.2d at 701; Foret, 628 So.2d at 1123. Daubert’s general “gatek-eeping” applies not only .to testimony based upon scientific knowledge, but also to testimony based on “technical” and “other specialized knowledge.” Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999); Independent Fire Insurance Company v. Sunbeam Corporation, 99-2181 (La. 2/29/00), 755 So.2d 226, 234. The trial court may consider one or more of the four Daubert factors, but that list of factors neither necessarily nor exclusively applies to all' experts or in every case. Kumho Tire, 526 U.S. at 141, 119 S.Ct. at 1171. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determinations. Kumho Tire, 526 U.S. at 142, 119 S.Ct. at 1171. |a()After medical school, Dr. Boudreaux trained for four years in obstetrics and gynecology. She began her private practice in Baton Rouge in 2010 and is board certified. She served on several hospital committees and is qualified to deliver babies and to examine babies prenatally. She estimated that she delivers 200 babies per year. Dr. Boudreaux performed the delivery of the victim in this case. Dr. Xiong’s expertise and specialization in neuropathology included conducting autopsies of brains on a near daily basis, and he conducted the autopsy of the victim’s brain herein. In addition to his medical school education, Dr. Xiong completed seven years general pathology and neuro-pathology training. The defense noted that it did not have any questions regarding Dr. Xiong’s education and experience. Dr. Xiong conceded that it was out of his area of expertise as to whether hippocampal malformation could cause food not to be. processed properly, but he was able to confirm that his practice or research did not show that hippocampal malformation could cause the lack of a desire to eat. Dr. Snider confirmed that he is board certified in anatomic forensic pathology and had five years of training in general anatomic pathology and a six-year residency, and subspeciality fellowship in forensic pathology. His training and residency took place from 1992 to 1997, while the fellowship took place from 1997 to 1998. His forensic pathology training focused on investigations of sudden unexplained deaths or deaths due to non-natural causes. He served as a medical examiner in Georgia, Florida, and Louisiana, conducing an average of 225 to 250 autopsies per year. Further, he had previously been qualified on multiple occasions as an expert in forensic and/or anatomic pathology. Dr. Snider performed the autopsy on the victim in this case. We find no abuse of the trial court’s broad discretion in its finding that the challenged testimony of Dr. Bou-dreaux, Dr. Xiong, and Dr. Snider was relevant and admissible. Dr. Snider’s testimony as to the cause and manner of the-victim’s Isideath.and whether the child suffered was based on his thorough autopsy examination of the victim’s body externally and internally.. Further, there was no abuse of discretion in the trial court’s determination that Dr. Boudreaux was qualified to render an opinion based on the photographs in evidence. Her testimony was not baseless, nor did it constitute an opinion on the ultimate fact at issue, since-she did not testify - that the defendant failed to feed the victim or was guilty óf murder in this case, but only that the victim was malnourished. We also note that Dr. Xiong informed the trial court of his 'area of expertise, conceding when a question was outside ⅛ area of expertise. Each of these physicians had specialized knowledge that assisted the trial court in understanding the evidence and determining facts. Moreover, the probative value of the physicians’ testimony was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the trier of fact, or by considerations of undue delay or waste of time. Thus, assignments of error, numbers three, four, five, and six lack merit. CONSTITUTIONALITY OF SENTENCING In assignment of error number eight, the defendant argues that life imprisonment is unconstitutionally excessive based on a “purported negligent failure to act on behalf of his baby son Joseph.” The defendant contends that the death of the victim is a harsh punishment in and of itself. He further contends that it was undisputed at trial and sentencing that he loved his children and was deeply distraught by what happened. The defendant concludes that in this case, the life sentence makes no measurable contribution to acceptable goals of punishment and is nothing more than the purposeless imposition of pain and suffering and is grossly out of proportion to the severity of the crime. The record before this court does not contain a copy of a motion to reconsider sentence or evidence that the defendant objected to or moved for reconsideration of the sentence. Louisiana Code of Criminal Procedure article |:⅛881.1(A)(1) requires a defendant or the State to make or file a motion to. reconsider sentence within thirty days of sentencing unless the trial court sets a longer period of time at the time of sentencing. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which, a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the State or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review. La. Code Crim. P. art. 881.1(E). As noted above, the record before us does not include a motion to reconsider sentence, nor did the defendant enter an objection after the sentence was imposed. To the extent that the defendant is challenging the evidence in support of the conviction, we note that the sufficiency of the evidence has been addressed herein and the record supports the conviction. As the defendant failed to comply with La. Code Crim. P. art. 881.1, he is barred procedurally from having, assignment of error number eight reviewed. See La. Code Crim. P. art. 881.1(E). See also State v. Duncan, 94-1563 (La, App. 1st Cir. 12/15/95), 667 So.2d 1141, 1143 (en banc per curiam). CONVICTION AND SENTENCE AFFIRMED. . The defendant was charged and tried along with wife and codefendant Ashley Cogar. They filed a joint motion to waive juiy trial, which was granted by the trial court. Like the defendant herein, the codefendant was found guilty of second degree murder, as charged. She appealed, and this court affirmed her conviction and sentence. See State v. Cogar, 2017-0426 (La. App. 1st Cir. 9/15/17), 2017 WL 4082432. . Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). . Dr. Boudreaux was accepted as an expert in obstetrician and gynecology without objection. Dr. Boudreaux also delivered the defendant’s previous baby. . We note that Dr. Boudreaux was allowed to answer these questions over defense objection as to her qualifications. The admissibility of the testimony will be addressed in the context of the assignment of error raised in that regard herein.- . Monica McDaniels, the manager of the Louisiana WIC program (a special supplemental nutrition program for women, infants, and children), testified that the defendant and co-defendant never applied for assistance for the victim based on the program’s -records. She further testified that she could not provide any information regarding their need for assistance, if any, - , . Merriam-Webster’s Dictionary defines “marasmus” as "a condition of chronic undernourishment occurring especially in children and usually caused by a diet deficient in calories and proteins.” Merriam-Webster Online Dictionary. http://www.merriamwebster. com (12 July 2017).